UNITED STATES, Appellee,

v.

John David PROVOO, Defendant-Appellant.

Nos. 272, 273, Docket 23084, 23130.

United States Court of Appeals Second Circuit.

Argued June 16, 17, 1954.

Decided Aug. 27, 1954.

George A. Spiegelberg, Mandeville Mullally, Jr., N. Peter Rathvon, Jr., and Murray E. Gottesman, New York City, for appellant.

J. Edward Lumbard, U. S. Atty., New York City, for appellee; Harold J. Raby, Leonard S. Sand and Powell Pierpoint, Asst. U. S. Attys., New York City, of counsel.

Before SWAN, MEDINA and HARLAN, Circuit Judges.

SWAN, Circuit Judge.

After a long jury trial the defendant was convicted of treason, as defined in Article 3, Section 3, Clause 1 of the Constitution and made punishable by statute, 18 U.S.C.A. § 2381.[1]  He was a staff sergeant in the United States Army who was captured by the Japanese upon the surrender of Corregidor, Philippine Islands.  The indictment charged twelve separate overt acts of treason alleged to have been committed by him between May 6, 1942 and August 14, 1945 while he was a prisoner of war.  Only seven of the overt acts charged were submitted to the jury, the others having been dismissed by the trial judge.  The jury found him guilty of four of the seven submitted, and as to three reached no agreement.  Of the four acts of which the defendant was found guilty one was an offer of services to the Japanese on Corregidor; another was reporting that Captain Thomson, who was also a prisoner of war on Corregidor, was anti-Japanese and uncooperative, with the result that Thomson was put to death by the Japanese; and the other two were radio broadcasts from Tokyo during the spring of 1944.  The main defense was duress and lack of treasonable intent.  On March 12, 1953 Provoo was sentenced to life imprisonment and the statutory mandatory fine of $10,000 was imposed.  He promptly appealed.  For convenience this will be referred to as the main appeal.

In April 1954, while the main appeal was pending, the defendant applied to the District Court pursuant to 28 U.S.C.A. § 2255 for an order vacating the judgment for treason, or, in the alternative, grant-

---

1. United States Constitution, Article 3, Section 3, Clause 1:

"Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort.  No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

Title 18 U.S.Code Annotated, Section 2381:

"Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined not less than $10,000; and shall be incapable of holding any office under the United States."

ing a new trial, on the ground that newly discovered facts showed that he had been tried in the wrong district in violation of the venue provisions of 18 U.S.C.A. § 3238. The motion was heard by Judge Noonan, on supporting and opposing affidavits, and was denied in an opinion not yet published in the Federal Supplement. D.C., 124 F.Supp. 185. From this order an appeal was duly taken. The two appeals have been argued together.

At the outset the court wishes to express to counsel for both parties appreciation for their able briefs and arguments. To the court-appointed attorneys for the defendant a great debt of gratitude is owing for the public service they have rendered without compensation. Both in the trial court and in this court attorneys of experience and professional distinction have devoted an enormous amount of time, energy and skill to provide the defendant with competent representation. The general public is perhaps unaware of how frequently members of the legal profession render gratuitously aid of this sort to the courts. The present case is a notable illustration of such public service.

On the main appeal the appellant has alleged numerous errors; they relate to the charge to the jury, the sufficiency of the evidence to support the verdict, the admission of certain exhibits, and alleged unfairness in the conduct of the trial, particularly in respect to cross-examination of the defendant which, it is urged, was intended to, and did, bring home to the jury collateral matters so prejudicial and inflammatory as to require a reversal for this reason alone, regardless of other errors. We shall at once address consideration to this contention.

The defendant took the stand in his own defense. His direct examination dealt with four periods of his life: (1) his birth in San Francisco in 1917 and the years prior to his capture by the Japanese in 1942; (2) his experiences and conduct while he was a prisoner of war; (3) his experiences in Japan after liber-ation by the American forces; (4) his return to the United States in April 1946 and his experiences in the Army from the date of his return up to September 2, 1949. The challenged cross-examination is concerned only with the fourth period. Provoo's direct examination on this period brought out that he had received an honorable discharge at Fort Dix, New Jersey on August 17, 1946; that he reenlisted at Camp Beale, California, on September 5, 1946, and thereafter was ordered to various Army posts and hospitals. At Fort Bragg, North Carolina, in 1948 and Fort Meade, Maryland, in 1949, he was imprisoned in the stockade, and on two other occasions he was under physical restraint during hospitalization at Walter Reed Hospital, Washington, D. C. While he was in the Walter Reed Hospital and in the stockade at Fort Meade he was interrogated by representatives of the Department of Justice concerning his prisoner of war days and gave signed statements. On September 2, 1949 he was brought under guard from Fort Meade to Fort Jay, Governors Island, N. Y., was ordered to accept an "undesirable discharge" from the Army, and was thereupon turned over to F. B. I. agents who forthwith arrested him on the charges of treason for which he was later indicted and tried.

The direct examination of Provoo on the subject of his experiences after reenlistment occupies less than ten pages of the record.[2] It contains no intimation as to the reason for his imprisonment at Fort Bragg and Fort Meade or for his confinement at the Walter Reed Hospital. Almost at once the cross-examiner put the question, "What were the circumstances, please, that caused your arrest and confinement," at Fort Bragg. An objection to this line of inquiry was overruled, and the cross-examination as to the reasons for his imprisonments and hospitalizations was continued over repeated objections for more than 200 pages of the record. It was designed to draw from the witness an admission that he had been charged with, or suspected

---

2. A copy of these pages appears as an appendix to this opinion.

of, being a homosexualist, and it culminated in the direct question: "Now, Mr. Provoo, isn't it a fact that in November 1946 you were hospitalized at Camp Lee, Virginia, because of homosexual aberrations?" A motion for a mistrial was promptly made and overruled, the court telling the jury that "this question and any similar questions and the answer to these questions is being permitted solely in connection with the question of the credibility and the weight to be given to the witness' testimony." The defendant answered that he was hospitalized at Camp Lee "because I was sick, and I haven't any idea what diagnosis was made at that time or what the doctor may or may not have put in his report at that time. But I am not a homosexual." The prosecutor then showed the defendant certain pages of Government's Exhibit 2 for identification (his army record) and asked if that refreshed his recollection as to the reason he was at the hospital at Camp Lee. The answer was that it did not refresh his recollection. He was then shown another page of Exhibit 2 for identification and asked if that refreshed his recollection as to the reason for his confinement in Fort Sill, Oklahoma in 1947. The defendant answered it did not but added "It does state I was a suspect." The next question was: "Now Mr. Provoo, isn't it a fact that you were sent from Fort Sill, Oklahoma to Brook General Hospital at Fort Sam Houston, Texas, because you were a homosexual suspect." The answer was "No, Sir. That is a lie." Similar questions were then asked as to the defendant's confinement at Fort Bragg, at the Walter Reed Hospital and at Fort Meade.

It is obvious that the cross-examination informed the jury that on several occasions after reenlistment the defendant had been charged with being, or suspected by military authorities or hospital doctors of being, a homosexualist. Neither by court martial nor by a civil court was he ever brought to trial and convicted on any charge of sodomy. Obviously such a charge was utterly irrelevant to the issue whether he had committed treason while a prisoner of war. But these highly inflammatory and prejudicial collateral and irrelevant charges were brought to the jury's attention. Nor was it done by accident or unintentionally. In colloquy between court and counsel in argument as to their admissibility, the prosecutor stated: "I also said I was going to bring it out through the defendant * * * and I made the declaration that if the defendant took the stand, he was laying himself open to that kind of cross-examination." That the facts so developed were so prejudicial as to constitute reversible error, if they were improperly admitted, is too plain for debate. They had no relevancy to charges on which he was being tried and were certain to degrade him in the eyes of the jury. See Gideon v. United States, 8 Cir., 52 F.2d 427, 430. We may add, in passing, that the use of Government's Exhibit 2 to impeach his testimony under guise of "refreshing his recollection" was at best questionable. See Wigmore, Evidence (3rd ed.) § 764 (Supp.) note 1.

Two theories are advanced by Government counsel in attempted justification for bringing such prejudicial matter to the knowledge of the jury. It is urged, first, that the direct examination "opened the door" to inquiry on cross-examination as to the true nature of defendant's incarceration and hospitalization; and, secondly, that in any event a defendant who takes the stand in a criminal trial may be questioned as to any criminal or immoral act of his life since such information is relevant to his credibility as a witness.

This court had occasion to discuss the doctrine of "opening the door" in United States v. Corrigan, 2 Cir., 168 F.2d 641, 645. As there explained, with the citation of authorities, "The doctrine * * * is an application of the principle of 'completeness'; that is, if one party to litigation puts in evidence part of a document, or a correspondence or a conversation, which is detrimental to the opposing party, the latter may introduce the balance of the document, correspondence or conversation in order to explain

or rebut the adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary." At page 3961 of the Record, in colloquy with counsel, the trial judge expressed the view that "a fair inference from that testimony [Provoo's testimony on direct examination that he had been confined in various stockades and hospitals in the United States after his reenlistment] would be that those incarcerations were a result, directly or indirectly of an investigation by either the Army or the F. B. I. of his conduct during his prisoner of war days." [3] We do not think such an inference was permissible. The Army lacked jurisdiction to court-martial him for conduct preceding his honorable discharge in August 1946, United States ex rel. Hirshberg v. Cooke, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621; hence it is not to be inferred that he was imprisoned by the Army for what occurred in Japan. Provoo's direct testimony was entirely neutral as to the cause of his confinements after reenlistment. Moreover, even on the assumption that the jury might infer that these confinements were related to his conduct as a prisoner of war, it is difficult to see how such an inference could be deemed *adverse* to the prosecution. The direct testimony contains no suggestion that the confinements were illegal or that the defendant was a victim of prolonged persecution. If sympathy could have been created by the fact of his frequent hospitalizations, we think it would have been far outweighed by the inference of guilt which the jury would be likely to attach to the fact of imprisonment. Pages 3872 to 3877 of the Record, reproduced in the appendix to this opinion, which are relied upon to support the court's decision that the door was opened so as to permit interrogation by the prosecutor to show that homosexuality was the real cause of Provoo's confinement in stockades and hospitals, contain nothing, in our opinion, to justify an application of the doctrine of "opening the door" to a cross-examination such as was here permitted.[3a]

We pass now to the alternative contention that even if the door was not opened to inquiry as to the true reasons for defendant's incarceration and hospitalization, the prosecution could lawfully cross-examine him as to immoral or vicious acts, since such information has a bearing upon the defendant's credibili-

---

**3.** At page 4123 of the Record the court stated to counsel in the absence of the jury:

"Now, I understand, Mr. Kove, from our previous discussion off the record, that you have questions which you propose to ask the defendant, along the line of whether or not any of these confinements or treatments in hospitals, or his incarcerations in Army stockades since his imprisonment at Sugamo, were based on homosexual acts alleged against him, and you have stated that you intend to ask those questions.

"On that score, I would say that I believe the prosecution is justified in attempting to elicit from the defendant the real reason for his confinement in these hospitals, and his incarceration in these various Army stockades, if for no other reason than the fact that on direct examination the defendant testified to these confinements and incarcerations and left, at least in my opinion, I don't know what the jury thinks, of course, the definite impression or inference that these confinements and incarcerations were as the result of investigations or inquiries being made by the appropriate authorities, in connection with the defendant's prisoner of war activities from the time of the fall of Corregidor, and I would think, in view of the fact that the door has been opened along that line of inquiry by the defendant himself on direct examination, that the Government would have the right to show the real reason or any other reason for the incarceration and confinements, to offset the inference which I think the defendant has sought to create."

**3a** It may be noted that the first mention by the cross-examiner of "homosexual abberations" was with reference to Provoo's hospitalization at Camp Lee. In his direct examination Provoo had merely named Camp Lee as the place where he was first stationed after reenlistment; he made no mention of having been hospitalized there. Plainly no door was opened to the cross-examiner's question as to whether homosexual aberrations were not the cause of his hospitalization at Camp Lee.

ty as a witness in his own behalf. It is true that a defendant who takes the stand subjects himself to cross-examination, within the limits of the appropriate rules of evidence, like any other witness, and may be cross-examined for the purpose of impeaching his credibility.[4] In People v. Sorge, 301 N.Y. 198 at page 200, 93 N.E.2d 637 it is stated that a defendant, like any other witness, may be interrogated upon cross-examination in regard to any vicious or criminal act of his life that has a bearing on his credibility. Whether this is a correct statement of the New York law we need not stop to consider.[5] Concededly local rules of evidence are not controlling in criminal trials in the United States courts. Rule 26, F.R.Cr.P., 18 U.S.C.A. In the Federal courts there has been an impressive unanimity of view on the point before us. As generally held, specific acts of misconduct not resulting in conviction of a felony or crime of moral turpitude are not the proper subject of cross-examination for impeachment purposes.[6] In this circuit, apparently under the influence of the broader New York rule, we have at times allowed impeaching questions as to misdemeanors, United States v. Cohen, 2 Cir., 177 F.2d 523, 525, certiorari denied 339 U.S. 914, 70 S.Ct. 568, 94 L.Ed. 1340; United States v. Minkoff, 2 Cir., 137 F.2d 402, 405; disbarment, United States v. Rubenstein, 2 Cir., 151 F.2d 915, certiorari denied 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462, and even criminal acts which were not established by a judgment of conviction. United States v. Schiller, 2 Cir., 187 F.2d 572;

United States v. Gruber, 2 Cir., 123 F.2d 307; United States v. Buckner, 2 Cir., 108 F.2d 921, certiorari denied, 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016; United States v. Frankel, 2 Cir., 65 F.2d 285. Of these last, however, one may be explained as tending to show the necessary criminal intent, United States v. Schiller, see concurring opinion of Frank, J., 187 F.2d at page 576, and two as proceeding on the theory that the door had been opened, United States v. Gruber, United States v. Buckner. Moreover, only two of the cases, United States v. Schiller and United States v. Cohen, were decided after the promulgation of the Federal Rules of Criminal Procedure had lessened the desirability of following New York decisions. Of these, Schiller, as noted, is explicable on other grounds, and Cohen (where this point received cursory treatment) involves no clear conflict with the majority rule. On the strength of this meager authority we cannot say that we are committed to a position so radically at variance with that of the other circuits as to allow this examination.

■ Even if the course of our precedents was clearer, we would have difficulty espousing the Government's position. Under F.R.Cr.P. 26 we are governed "by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." In proposing the rule, the Notes of the Advisory Committee remark that: "Since all federal crimes are statutory and all criminal prosecutions in the federal courts are

4. Reagan v. United States, 157 U.S. 301, 305, 15 S.Ct. 610, 39 L.Ed. 709; United States v. Gates, 2 Cir., 176 F.2d 78, 79; Coulston v. United States, 10 Cir., 51 F. 2d 178, 181.

5. Cf. People v. Malkin, 250 N.Y. 185, 164 N.E. 900; People v. Bloodgood, 251 App. Div. 593, 298 N.Y.S. 91; People v. Bilanchuk, 280 App.Div. 180, 112 N.Y.S.2d 414; Wigmore on Evidence, 3rd Ed., § 987.

6. Campion v. Brooks Transp. Co., 77 U. S.App.D.C. 293, 135 F.2d 652; Scaffidi v. United States, 1 Cir., 37 F.2d 203; United States v. Klass, 3 Cir., 166 F.2d

373; Simon v. United States, 4 Cir., 123 F.2d 80, 85, certiorari denied 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555; Henderson v. United States, 6 Cir., 202 F.2d 400, 405; Pearson v. United States, 6 Cir., 192 F.2d 681, 699; Ross v. United States, 7 Cir., 93 F.2d 950; Echert v. United States, 8 Cir., 188 F.2d 336; Packineau v. United States, 8 Cir., 202 F. 2d 681; Little v. United States, 8 Cir., 93 F.2d 401, 408, certiorari denied 303 U.S. 644, 58 S.Ct. 643, 82 L.Ed. 1105; Lennon v. United States, 8 Cir., 20 F.2d 490, 494; Ingram v. United States, 9 Cir., 106 F.2d 683.

based on acts of Congress, uniform rules of evidence appear desirable if not essential in criminal cases, as otherwise the same facts under differing rules of evidence may lead to a conviction in one district and to an acquittal in another." We have set forth above the interpretation of the common law adopted by the overwhelming majority of federal courts. As for experience, Wigmore, Evidence (3d ed.) §§ 980(a)–983 presents numerous examples of the abuses resulting from unrestrained inquiry into a witness's history, suggests that the inquiry be confined to the trait of veracity, § 982 (1), and offers the suggestion that a defendant-witness is entitled to even greater protection, in order to prevent unfair prejudice. §§ 891(3), 983(4), 2277(4). As for reason, we do not conceive that inquiry into every accusation of criminal or vicious conduct will further the search for truth. Where, as here, the defendant's general character has not been put in issue, it is difficult to justify any examination other than into the trait of veracity. No authority has been cited which suggests that homosexuality indicates a propensity to disregard the obligation of an oath. The sole purpose and effect of this examination was to humiliate and degrade the defendant, and increase the probability that he would be convicted, not for the crime charged, but for his general unsavory character. Permitting it was error.

The error was plainly prejudicial. Indeed we can conceive of no accusation which could have been more degrading in the eyes of the jury nor more irrelevant to the issue of treason on which he was being tried. On the main appeal the judgment must be reversed and the cause remanded for a new trial. This disposition makes unnecessary consideration of the other alleged errors in the course of the trial.

■ We are also convinced that error was committed in denying the defendant's motion to vacate the judgment of conviction on the ground that newly discovered evidence showed that he had been tried in the wrong district. In a

criminal trial in the federal courts venue must be proved, in the absence of waiver, like any other material allegation of the indictment. United States v. Johnson, 323 U.S. 273, 65 S.Ct. 249, 89 L.Ed. 236; United States v. Brothman, 2 Cir., 191 F.2d 70; United States v. Jones, 7 Cir., 174 F.2d 746. The venue for trial of acts of treason committed on Corregidor or in Japan is governed by 18 U.S.C.A. § 3238:

> "The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought."

■■ We are concerned only with the term "found," since Provoo was not under restraint when he returned from Japan in 1946, and, therefore, was not "brought" into the district where the ship landed him. Chandler v. United States, 1 Cir., 171 F.2d 921, 933; Kerr v. Shine, 9 Cir., 136 F. 61; United States v. Townsend, D.C., S.D.N.Y., 219 F. 761. At the trial Judge Noonan correctly charged the jury that the words "district where the offender is found" as used in the statute mean the district "in which the defendant is first apprehended or arrested or taken into custody, under charges later found in the indictment"; and that the southern district of New York covers Fort Jay, Governors Island. The evidence before the jury showed that Provoo had been brought by the Army from Fort Meade to Fort Jay, where F. B. I. agents, immediately after his separation from military service, took him into custody under a commissioner's warrant of arrest charging him with treason. Beyond question the jury's finding as to venue was sustainable on the record as it then was. But subsequent to the conviction, Provoo's counsel, with the cooperation of the United States Attorney and the Army, obtained confidential records not previously available, which led counsel to believe that the southern district of New York was not the proper venue for the trial. On the

basis of such newly discovered evidence a motion was made under 28 U.S.C.A. § 2255 to vacate the conviction.

■ The newly discovered evidence may be briefly summarized as follows: On June 2, 1949 Provoo was a military prisoner at Fort Meade awaiting disposition of charges of sodomy lodged against him under the Articles of War. At the request of the Department of Justice which was investigating the possibility of his having committed acts of treason while a prisoner of war, the Army delayed for four months court-martial proceedings on the sodomy charge, finally dropped this charge, and brought Provoo to New York to effectuate here an undesirable military discharge and to turn him over to F. B. I. agents in order that he might be arrested, indicted and tried for treason in the southern district of New York. Had the newly discovered evidence been before the jury, we do not believe that the jury would, or could legally, have found that Provoo was "first apprehended or arrested or taken into custody" in the southern district of New York under the charges of treason on which he was later indicted.

The Government argues that the purpose of the venue statute is not to fix the place of arrest but simply to have the place of trial conform to the place of arrest. We agree. The argument then proceeds that Provoo was not arrested under treason charges until he was brought to Fort Jay. This is true so far as arrest by civil authorities is concerned but is it true with respect to military authorities? We think not. After the Army had agreed with the Department of Justice that the sodomy charge should be dropped, the Army continued to hold him in restraint solely in order to bring him to New York to be tried for treason in the District Court here. There could be no military purpose for continuing his imprisonment. The Army had determined to drop the sodomy charge; and he could not be tried by court-martial for treason or any other offense committed during his previous enlistment. United States ex rel. Hirshberg v. Cooke, 336 U.S. 210, 69 S.Ct. 530, 93 L.Ed. 621. It is urged that he was brought to Fort Jay for the military purpose of effectuating his discharge from the Army. But his discharge could, and in accordance with usual procedure would, have been effectuated at Fort Meade or at some point closer to his home than Fort Jay.[7] We cannot blind our eyes to the fact that the real purpose in bringing him to New York was to meet the wish of the Department of Justice to have him tried for treason under the indictment subsequently filed here. Consequently we hold that the continuance of Provoo's restraint in Fort Meade, after the Army had dropped the sodomy charge, for the purpose of bringing him to New York for trial, was an apprehension for treason and that he was "found" in Maryland within the meaning of the venue statute. To hold otherwise would mean that the Army, acting in cooperation with the Department of Justice, can select any federal district in the United States as the place for trial of a soldier charged with treason or any other offense committed abroad.

■ Such a holding would be directly opposed to the principle enunciated by Chief Justice Marshall in Ex parte Bollman, 4 Cranch. 75, 136, 2 L.Ed. 554.

"* * * It would, too, be extremely dangerous to say, that because the prisoners were apprehended, not by a civil magistrate, but by the military power, there could be given by law a right to try the persons so seized, in any place which the general might select, and to which he might direct them to be carried."

---

7. See Memorandum No. 210–200–1 issued by the Department of the Army October 13, 1948 and in effect in September 1949, which provides (inter alia) that "Department of Army personnel will continue to be separated at places of separation at or nearest to their duty station and in the direction of their home, with a view of keeping all travel, in connection with separation at a minimum."

The Government attempts to distinguish the Bollman case because there the Army's arrest of the defendants was for treason while here Provoo's initial incarceration by the Army was for sodomy and he was never formally charged by the Army with treason. But for the reasons already stated we think the attempted distinction is unsubstantial. Otherwise the Government would be able to handpick its forum. We realize that the Government can do just that under the "first brought" provision,—barring an accidental landing such as occurred in Chandler v. United States, 1 Cir., 171 F. 2d 921. But the fact that when an offender has been arrested on the high seas or abroad, the Government may choose the district into which to bring him, does not seem an adequate reason for permitting the Government to take him into custody in a district where a Federal court exists with jurisdiction to try the alleged offense for which he is held in custody and then transport him to another district for trial there. The courts must take the statute as they find it and should not whittle away the "found" provision by a construction based on formalism rather than substance. As the Supreme Court stated in United States v. Johnson, 323 U.S. 273, at page 275, 65 S.Ct. 249, at page 251: "Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed."

The judgment and the order are both reversed and the cause is remanded for further proceedings consistent with this opinion.

Appendix to Opinion

Pages 3871 to 3880 of the Record.

"Q. Where were you first stationed after you reenlisted? A. I was sent to Camp Lee, now Fort Lee, Virginia.

"Q. And from there, sir, what other camps were you then stationed at? A. Fort Sill, Oklahoma.

"Q. While you were at Fort Sill, did anything occur with respect to consideration of yourself for Officers Candidate School? A. I applied for Officers Candidate School, at Fort Sill.

"Q. And were you accepted? A. I had passed the—I qualified for OCS, but there was a circular came out about that time, and I was over age, I was twenty-eight at the time, and I was not eligible.

"Q. All right, sir. And after Fort Sill—oh, while you were at Fort Sill—withdrawn.

"After Fort Sill, to what Army post were you next transferred? A. Fort Sam Houston.

"Q. And after Fort Sam Houston? A. Fort Bragg, North Carolina.

"Q. While you were at Fort Sill, to what kind of unit were you attached? A. The artillery school, 3rd Detachment, the artillery school.

"Q. And while you were at Fort Sam Houston, to what sort of unit were you attached? A. I was hospitalized there. I was in the Detachment of Patients.

"Q. While you were at Fort Bragg, to what sort of unit were you attached? A. 82nd Airborne.

"Q. From Fort Bragg, where were you then transferred? What was your next Army post? A. I was at Walter Reed.

"Q. That is, Walter Reed General Hospital? A. Yes, sir.

"Q. And from Walter Reed General Hospital, what was your next post? A. 2nd Army, Fort Meade, Maryland.

"Q. Now, beginning with the time that you came back to the United States from Japan— A. Yes, sir.

"Q. —in 1946, when were you next questioned or interrogated by anyone concerning anything that had happened while you were a prisoner of war of the Japanese? A. Well, when I first—the first time I

was questioned was in the convalescent area at Brook Hospital, in the fall of 1947.

"Q. Before we go on with that, let me ask you this: When you came back to the United States, please list all of the hospitalization that you had while you were still in the service, from '46 on, what hospitals you were at, and for how long you were there at each particular hospital. A. Before discharge or after reenlistment?

"Q. Before and after, during your first term, your second term of enlistment in the service. A. I was in the hospital a few days at Fort Dix before I started on recuperative leave. Then after the reenlistment, I was in the hospital at—in the station hospital the following fall in 1947, at Fort Sill, and then went to Brook—

"Q. How long were you in the hospital at Fort Sill? A. Just a week, I think.

"Q. All right. Then you were at Brook General Hospital, which is Fort Sam Houston? A. Yes, sir.

"Q. How long were you in the hospital there? A. A few weeks.

"Q. And after that were you in any other hospital? A. I was in Walter Reed.

"Q. How many times were you in Walter Reed Hospital? A. I think twice.

"Q. In what years? A. '48 and '49.

"Q. And for how long a period on each occasion, as best as you can recall? A. In 1948, I was there for over four months.

"Q. And in 1949? A. In 1949, I was there for a little less than two months.

"Q. Now, going back to this question of the interrogation of yourself by any agency regarding your PW period, you say that first began when, in what year, after you returned to the States? A. 1947, at Brook Army Hospital, Fort Sam Houston.

"Q. And how many times can you recall having been questioned while you were at that hospital? A. I think it was just once.

"Q. And do you know who it was that questioned you? A. No, sir.

"Q. Did you sign any statements at that time that you can recall? A. I did, sir.

"Q. Was it a statement that you wrote out or one that prepared and you signed? A. It was a statement, it was a statement, I answered questions and they typed it up, and I signed it.

"Q. Thereafter, when were you next interrogated? A. Excuse me. Might I explain that that in no way pertained to me, that statement had nothing to do with my case.

"Q. Not concerning you personally, but concerning the period during which you were a prisoner of war? A. Yes, sir.

"Q. It concerned other prisoners of war, did it not, sir? A. No, sir, it didn't.

"Q. All right. When was the first time that you were interrogated concerning yourself? A. In, I think it was, the spring of 1949.

"Q. At that time who questioned you? A. The Federal agents.

"Q. Where was it that you were questioned? A. At Walter Reed.

"Q. Walter Reed General Hospital? A. Yes, sir.

"Q. Were you a patient there at the time you were questioned? A. I was—

"Q. Were you a patient there? A. I was confined there.

"Q. As a patient? A. I don't know. I haven't got the record to hand.

"Q. How many times were you questioned while you were at Walter Reed Hospital? A. I guess three or four times, maybe more.

"Q. Did you sign any statements? A. I signed a statement there.

"Q. Was it one you wrote out yourself? A. Yes, sir.

"Q. Now, after this period, were you—withdrawn.

"At any time after you came back to the United States, were you ever placed in any form of prison or stockade while you were in service? A. Yes, sir, I was in the stockade at Fort Bragg.

"Q. Yes, sir? Were you at the stockade in any other? A. I was in the stockade at Fort Meade.

"Q. Now, while you were in the stockade at either of these two places, were you ever questioned concerning yourself and with reference to the time that you had been a prisoner of war of the Japanese? A. No, sir.

"Q. At any other time while you were still in the service on duty, were you questioned with reference to yourself concerning the time you had been a prisoner of war of the Japanese? A. Yes, sir, I was questioned a number of times.

"Q. And who was it that questioned you throughout this period? A. Medics.

"Q. Were you ever questioned by any representatives of the Department of Justice? A. Not that I know of, sir.

"Q. Did you ever sign any statements? A. At Walter Reed, I did, sir.

"Q. Apart from Walter Reed, were you ever questioned by any representatives of the Department of Justice or asked to sign any statements for them? A. Yes, sir, it was while I was in the stockade at Fort Meade.

"Q. All right. How many times were you questioned there, do you recall? A. Well, every day; I mean for a week or so.

"Q. How many statements did you sign while you were there, if you recall? A. I don't know. Two or three.

"Q. Now, was there a time, sir, while you were at Fort Meade—oh, withdrawn.

"From what date to what date were you in the stockade at Fort Meade as a prisoner? A. June, July and August, 1949.

"Q. Where were you on September 1, 1949? A. In the stockade at Fort Meade.

"Q. Where were you on the morning of September 2, 1949? A. In the same stockade.

"Q. Did anything happen on September 2, 1949, with reference to your leaving the stockade at Fort Meade? A. Yes, sir. I was brought down here to Governor's Island.

"Q. How were you brought here, to Governor's Island? A. On the train.

"Q. Were you in any form of restraint? A. I was handcuffed.

"Q. Was there anyone along with you? A. Yes, sir.

"Q. Who? A. A military police lieutenant, Monroe, and another noncom.

"Q. Where did they take you to? A. To Fort Jay, Governor's Island.

"Q. What happened when you got to Fort Jay? A. I asked if I was still required to—I had been placed under orders making me incommunicado before I left Fort Meade, and I asked whether I was at liberty to speak, and they told me I wasn't. So I didn't talk until we got in the office.

"Q. Did anyone speak to you? A. No, sir.

"Q. Did there come a time when anyone gave you some papers and asked you to sign them? A. Yes, sir.

"Q. What were those papers? A. It was marked 'Undesirable Discharge.'

"Q. What did they say to you in connection with those papers? A. They said, 'This is your separation, and you got to sign it.'

"Q. What did you say? A. I refused to sign.

\* \* \* \* \* \*

"Q. Did there come a time when you signed this paper? A. Yes, sir.

"Q. What happened after you signed this paper? A. I was given a direct order to sign it, and I signed it.

"Q. Yes, sir. After that, what happened? A. They took off the Army handcuffs and put on the others.

"Q. Which others? A. The Federal Agents'."