**UNITED STATES of America, Appellee,**

v.

**Alfred CATINO, Defendant-Appellant.**

**No. 956, Docket 83–1419.**

United States Court of Appeals,
Second Circuit.

Argued March 22, 1984.

Decided May 24, 1984.

Certiorari Denied Oct. 1, 1984.
See 105 S.Ct. 180.

Alan Scribner, Contoocook, N.H. (Jeffrey D. Ullman, New York City, of counsel), for defendant-appellant.

David S. Hammer, Asst. U.S. Atty., S.D. N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Benito Romano, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Before LUMBARD, NEWMAN and PRATT, Circuit Judges.

LUMBARD, Circuit Judge:

Alfred Catino appeals from his conviction entered June 4, 1983, in the Southern District of New York, Gagliardi, J., following his conditional guilty plea. Catino pleaded guilty to two counts: failing to appear on March 17, 1975, to begin serving a jail sentence imposed on a prior conviction, in violation of 18 U.S.C. § 3150; and, while a fugitive in France, using an American passport issued in a false name, in violation of 18 U.S.C. § 1542. The district court denied his motion to dismiss the bail jumping charge as time barred, and his motion to dismiss the passport violation charge for lack of venue. We affirm.

I.

In January, 1974, Catino was convicted by a jury in the Southern District on two counts of narcotic law violations before Judge Pollack, who sentenced Catino on

February 26, 1974, to two concurrent twelve year terms of imprisonment, to be followed by a special parole of six years, and $25,000 fine. Catino was released on a $50,000 appellate bond pending appeal.

On December 13, 1974, we affirmed Catino's conviction by order. Catino was instructed to surrender on March 17, 1975, to begin serving his sentence. When he failed to do so, Judge Pollack issued a bench warrant for his arrest.

On August 12, 1976, while still a fugitive, Catino applied for, and was issued, a United States passport in Boston under the name Frank Anthony Casta. He immediately used the passport to travel in and out of France.

In February, 1977, Catino was indicted in the Eastern District of New York for importing heroin into the United States from France, and for conspiracy to import heroin, in violation of 21 U.S.C. §§ 952(a), 963. At the same time, French police informed the United States Drug Enforcement Agency (DEA) that they had discovered Catino in Le Havre, in the presence of another suspected narcotics dealer.

Upon being informed of Catino's whereabouts, the United States Attorney in the Southern District requested, through diplomatic channels, that French police provisionally arrest Catino on Judge Pollack's outstanding bench warrant pending a formal extradition request. On March 4, 1977, before such provisional arrest was made, however, the French police, under French law, arrested Catino, along with four other men carrying two kilograms of heroin, and seized Catino's passport. Two weeks later, the French government detained Catino pursuant to the Southern District's request for provisional arrest, pending a formal proceeding.

While in French prison awaiting trial, Catino wrote to, and was visited by, officials from the United States Attorney's Office and the DEA. Although there is no record in the Justice Department's files showing that Catino formally consented to extradition, he did at the time indicate his desire to return to the United States.[1]

Contemplating that French authorities would not return Catino until after his prosecution in France was complete and he had served his prison term, if any,[2] the United States, on April 27, 1977, applied to withdraw its earlier request for Catino's provisional arrest and indicated it would renew the request at a later time. On May 16, 1977, Catino was freed from the detainer for extradition. The next day, however, a DEA agent visited Catino in prison and told him that despite the withdrawal of the detainer, the United States would seek extradition again after the resolution of the then pending French charges.

Over the next few months, Catino had a change of mind. On October 7, 1977, he wrote to the United States Embassy in Paris, stating that the United States was "divested of all legal jurisdiction over my person" because it had allegedly delayed extradition proceedings until after the French police arrested him on their own charges.

Ten days later, on October 17, the United States formally requested Catino's extradition, based on the February 1977 narcotics importation indictment filed in the Eastern

---

1. Catino contends that he signed a waiver form at the French Ministry of Justice in March, 1977, but that, since the Southern District withdrew its request for provisional arrest and never perfected its extradition request, the form was never sent to the Justice Department. In any event, on March 15, 1977, Catino wrote to DEA Agent Ronald Provencher at the American Embassy, requesting him to talk to Assistant United States Attorney James Lavin and "ask him how fast he can get me back to New York! I don't think I can last another month here."

2. The Extradition Convention, Jan. 6, 1909, United States-France, artic. IX, 37 Stat. 1526, as amended, February 12, 1970, 22 U.S.T. 407, provides:

If the person whose extradition may be claimed, pursuant to the stipulations hereof, be actually under prosecution for a crime or offense in the country where he has sought asylum, or shall have been convicted thereof, his extradition may be deferred until such proceedings be terminated and until such criminal shall be set at liberty in due course of law.

District of New York. Catino opposed this request in proceedings before a French tribunal, which deferred its decision pending additional evidence requested from the United States.

On November 13, 1978, during the pendency of the extradition proceedings, Catino was convicted on the French charges, and sentenced to 5 years in prison and fined. The court also ordered that, after serving of the prison term, he be "permanently barred residence in French territory."

The French government then opposed the extradition request on the grounds that as to both the importation and conspiracy charges, he already had been convicted for the same conduct in France, and on December 20, 1978, the extradition tribunal denied extradition.

Catino completed serving his French sentence on January 21, 1981. French authorities immediately enforced the expulsion order by placing Catino on a plane bound for John F. Kennedy International Airport, located in the Eastern District of New York. Upon his arrival, Catino was arrested by DEA agents on a warrant pursuant to the 1977 Eastern District narcotics importation indictment.

On April 3, 1981, however, the Eastern District indictment was dismissed on the government's motion and Catino transferred to the custody of the Southern District in compliance with the fugitive warrant issued by Judge Pollack in March, 1975, and began serving the sentence imposed upon him in January, 1974.

On October 18, 1982, seven and a half years after Catino had become a fugitive, he was indicted in the Southern District for bail jumping, 18 U.S.C. § 3150. On March 1, 1983, the district court denied Catino's motion to dismiss the indictment for being time barred.

On March 15, 1983, before trial on the bail jumping charge,[3] a superseding indictment was filed in the Southern District, which added a charge that while in France, he used the United States passport issued to him under the false name Frank Casta. Catino's motion to dismiss the passport count, on the ground that venue for the charge lay exclusively in the Eastern District, was denied on May 5, 1983.

Pursuant to an agreement with the government which preserved his right to appeal from the denial of his motion to dismiss, Catino pleaded guilty on June 4, 1983, to both counts of the superseding indictment. On November 18, 1983, the district court sentenced Catino to three years in prison on the bail jumping charge, to run consecutively to the twelve-year sentence he was then serving, and three years' special probation on the passport charge, to follow his release from prison. We affirm.

II.

■ The federal statute of limitations for non-capital crimes, 18 U.S.C. § 3282, declares that no person may be prosecuted "unless the indictment is found or the information instituted within five years" after the commission of the offense. The statute, however, does not run in favor of "any person fleeing from justice." 18 U.S.C. § 3290. This exception is comprehensive, in that a person fleeing from justice in one jurisdiction loses the benefit of the statute of limitations for all charges in all federal jurisdictions. *United States v. Gonsalves*, 675 F.2d 1050, 1052–53 (9th Cir.), *cert. denied*, 459 U.S. 837, 103 S.Ct. 83, 74 L.Ed.2d 78 (1982) (flight from Nevada tolled statute in California); *King v. United States*, 144 F.2d 729, 731 (8th Cir. 1944), *cert. denied*, 324 U.S. 854, 65 S.Ct. 711, 89 L.Ed. 1413 (1945) (flight from Texas tolled statute in Arkansas).

Catino concedes that he became a "person fleeing from justice" upon his failure to appear for sentencing in March, 1975, but Catino argues that his fugitive status ended in March, 1977, when he consented to extradition to the Southern District. Al-

---

3. At this time, Catino was in the Metropolitan Correctional Center in the Southern District of New York.

though the government agrees that a fugitive who executes a formal and voluntary consent to extradition regains the benefit of the statute of limitations, *United States v. Gonsalves, supra,* 675 F.2d at 1055 (statute begins to run upon good faith effort to surrender), it disputes whether Catino had actually done so.

The district court assumed arguendo that Catino had consented to extradition in March, 1977, but declined to make a factual finding on this point, as, in its view, the issue was irrelevant. As evidenced by his letter of October 10, 1977, Catino obviously had changed his mind about returning to face imprisonment as well as new charges in the United States. On December 14, 1977, Catino opposed an extradition request made by the Eastern District, and continued to do so until the request was denied on December 20, 1978. The court reasoned that, whatever Catino's status from March through December 1977, his resistance to extradition to the Eastern District made him a "person fleeing from justice" with regard to those charges, at least until the extradition proceedings ended. Since tolling of charges in one district tolls the statute in all federal districts, the court concluded that prosecution in the Southern District for bail jumping was not time barred. We agree.

■ The tolling provision of 18 U.S.C. § 3290 commences when a person absents himself from a jurisdiction where an offense has been committed with the intent of avoiding arrest or prosecution. *Jhirad v. Ferrandina,* 486 F.2d 442 (2d Cir.1973) (*Jhirad I*). A person can be "fleeing from justice" in one jurisdiction even though in prison in another. *Taylor v. United States,* 238 F.2d 259 (D.C.Cir.1956). Catino concedes that a fugitive who is imprisoned in a foreign jurisdiction and then resists his return to the United States may *remain* a "person fleeing from justice," *United States v. Greene,* 146 F. 803 (S.D.Ga.1906), aff'd, 154 F. 401 (5th Cir.), *cert. denied,* 207 U.S. 596, 28 S.Ct. 261, 52 L.Ed. 357 (1907); *cf. United States v. Estremera,* 531 F.2d 1103, 1108 (2d Cir.), *cert. denied,* 425 U.S.

979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976) (during time defendant resisted deportation proceedings in Canada instituted in good faith by United States officials he loses, protection of Speedy Trial Act). However, he argues that a non-fugitive cannot *become* a fugitive by virtue of his resistance to extradition. We disagree.

■ The intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending. *Matter of Assarsson,* 687 F.2d 1157, 1161–62 (8th Cir.1982); *United States v. Ballesteros-Cordova,* 586 F.2d 1321, 1324 (9th Cir.1978). This is true whether the defendant leaves the jurisdiction intending to avoid prosecution, or, having learned of charges while legally outside the jurisdiction, "constructively flees" by deciding not to return. *Jhirad v. Ferrandina,* 536 F.2d 478, 483–84 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976) (*Jhirad II*). The fact that the authorities know of the defendant's whereabouts outside of the jurisdiction does not of itself start the statute running. *Jhirad II, supra.* Even in such circumstances, the statute is tolled until the defendant takes steps to return.

This is a somewhat harder case than *Assarsson* and *Jhirad II,* however. In both those cases, the defendants moved freely about outside the jurisdiction where charges were pending against them, and were thus free to return to face prosecution. Here, at the moment that, according to the district court, Catino regained fugitive status, he had *no such control* over his movements, as he was in French prison awaiting trial on French charges.

■ Although Catino's imprisonment prevented him from returning, we do not think he was relieved of a duty to do all he could to return. As it was, instead of consenting to return to the United States, he actively resisted the extradition request throughout the proceedings. This fact, coupled with his letter expressing a desire to resist all future extradition requests, constituted a constructive flight from jus-

tice, thereby tolling the statute of limitations period.

We need not decide whether Catino regained the benefit of the statute of limitations upon the French refusal in December 1978 to grant extradition to the Eastern District, as, in any event, the Southern District indictment of October 1982 was returned within the limitations period.[4]

▪ We disagree with Catino's argument that the district court's holding impermissibly penalizes a defendant for asserting his right to oppose extradition since "to claim the benefit of the statute of limitations, he would have to give up his right to resist unlawful extradition." First, his argument mischaracterizes the nature of the Eastern District's extradition request. There was nothing illegal about that request; it simply proved unsuccessful. Catino was extraditable, as Article II of Extradition Convention between France and the United States includes traffic in, and possession of, heroin and other narcotics as extraditable offenses. However, France chose to exercise its discretion, pursuant to Article IX of the Convention, see n. 2 supra, to prosecute Catino under its own laws and have him serve his French sentence, if any, before extradition.

More fundamentally, Catino's contention that the tolling of the statute of limitations depends on the merits of his arguments in extradition proceedings is unsound. However meritorious Catino's arguments were, "[i]t is the intent to avoid the jurisdiction and processes of the courts in the judicial district in which the crime is charged to have been committed which takes away from the person charged the privilege of pleading the statute of limitations." United States v. Greene, supra, 146 F. at 890.

Of course, Catino faced a choice whether to exercise his right to oppose extradition, or gain the benefit of the statute of limitations by fulfilling his duty to do all in his power to return to the United States. In the case where a defendant chooses the former course, the price for that choice is loss of the benefit of the statute of limitations. Nor is there any merit to the argument that it is unconstitutional to require a defendant to make such a choice. Cf. McGautha v. California, 402 U.S. 183, 213, 91 S.Ct. 1454, 1470, 28 L.Ed.2d 711 (1971) (in a capital case in which guilt and punishment determined in same trial, defendant who chooses to testify concerning punishment may be compelled thereby to waive privilege against self-incrimination concerning guilt).

### III.

Catino challenges his conviction for misuse of an American passport on two grounds.[5] First, he argues that he could not be tried in the Southern District on this charge, as venue lay exclusively within the Eastern District. Second, Catino argues that even if venue lay in the Southern District, the government violated Justice Department policy by prosecuting him for a crime for which he had already been convicted in France, without first obtaining the approval of the United States Attorney General. We find both of these contentions to be without merit.

Count Two of the superseding indictment charged that Catino, while in France, used a falsely secured American passport, in violation of 18 U.S.C. § 1542. As this offense was alleged to have been committed outside the jurisdiction of any district, venue lies only "in the district where the offender is arrested or first brought." 18 U.S.C. § 3238. Catino contends that in his case, for all crimes committed outside the United States, venue lies exclusively in the

---

**4.** Even if, as the district court assumed arguendo, the statute was running from March, 1977, to December, 1977, when Catino opposed extradition, there would have been four years and three months left under the statute when France denied extradition in December, 1978. Catino's indictment in October, 1982, would thus have been within the limitations period.

**5.** The statute of limitations period for a passport charge brought under 18 U.S.C. § 1542 is ten years, see 18 U.S.C. § 3291, and thus is not available as a basis for challenging the conviction.

Eastern District under either the "first brought" or "arrested" tests, as the plane on which French officials placed him landed at Kennedy Airport, located in the Eastern District, and DEA agents arrested him there pursuant to an Eastern District warrant on the heroin importation charge.

■ We need not concern ourselves with the term "first brought," as that applies only in situations where the offender is returned to the United States already in custody. *United States v. Provoo*, 215 F.2d 531, 537 (2d Cir.1954); 8A Moore's Federal Practice ¶ 18.03[2] at 18–22 (2d ed. 1983). Here, Catino was not arrested until he arrived in New York.

■ Where a defendant is not taken into custody before his arrival in this country, "the purpose of the venue statute is not to fix the place of arrest but simply to have the place of trial conform to the place of arrest." *United States v. Provoo, supra,* 215 F.2d at 538. Courts consistently have interpreted "arrested" in § 3238 to mean that "venue is in that district ... where the defendant is first restrained of his liberty *in connection with the offense charged.*" *United States v. Erdos,* 474 F.2d 157, 160 (4th Cir.), *cert. denied,* 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122 (1973) (emphasis added); *United States v. Provoo, supra.*

■ Upon his return, Catino was immediately arrested in the Eastern District on narcotics trafficking charges. After those charges were dropped he was further restrained so that he could be transferred to the Southern District to begin serving a previously imposed sentence. It was not until March, 1983, when Catino was already in custody at the Metropolitan Correctional Center in the Southern District that he was indicted and arraigned for *passport* violations. It is irrelevant that the government could have charged Catino in the Eastern District for the passport charge, as the statute does not dictate the place of arrest.

*United States v. Provoo, supra.* Since the Southern District was the district where Catino was actually restrained in connection with the passport charge, venue lay exclusively within that district.

*United States v. Provoo, supra,* is not to the contrary. There, a serviceman who had returned from overseas, not already in custody, was arrested by military authorities in Maryland on sodomy charges. After the charges were dropped, however, the military authorities continued to hold him, and brought him under guard to New York, where he was arrested, indicted and tried by civil authorities for treason allegedly committed while a Japanese prisoner of war. Interpreting a predecessor of § 3238, which placed venue for extraterritorial offenses "in the district where the offender is found, or into which he was first brought," [6] we found that venue for the treason charge was properly in Maryland. As the army continued to hold him in Maryland after the sodomy charge was dropped solely in order to send him to New York to be tried for treason, we concluded that this continued restraint "was an apprehension for treason." Thus, he was "found" in Maryland within the meaning of the venue statute. 215 F.2d at 538. Had the court read the statute as Catino now urges us to read § 3238, it would not have had to explain why Provoo's continued restraint in Maryland constituted an arrest on the treason charge. Instead, it would have stated that the defendant was first arrested in Maryland on sodomy charges, and therefore venue for all extraterritorial crimes lay in Maryland.

Catino argues that even if venue lay in the Southern District, his conviction on the passport charge should be dismissed because the government violated the "*Petite* policy" by prosecuting him without first obtaining the consent of the Attorney General. He claims that this approval was needed because he had already been con-

---

**6.** Under the old statute, "found" meant "arrested." 8A Moore's Federal Practice ¶ 18.03[2] at 18–22 n. 29.

victed in France on similar charges. We disagree.

The *"Petite policy"* refers to Justice Department guidelines first announced by the Attorney General in 1959, and discussed by the Supreme Court in *Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). As currently applied, the policy precludes successive federal prosecutions against a defendant for offenses arising out of a single transaction, or federal prosecutions for offenses already prosecuted at the state or local level, without the approval of the Attorney General. United States Dep't of Justice, United States Attorneys' Manual, Tit. 9, § 2.142 (1980).

By its own terms, the *Petite* policy speaks only to domestic prosecutions, not foreign ones as are involved here. Even as regards a federal prosecution following a state conviction for the same conduct, however, the policy affords defendants no substantive rights. It is "merely an internal guideline for exercise of prosecutorial discretion, not subject to judicial review." *United States v. Ng,* 699 F.2d 63, 71 (2d Cir.1983).

The convictions on both counts are affirmed.