UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-30998
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

VERSUS

CURTIS ALAN WHARTON,
Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Louisiana
_____

February 4, 2003

Before GARWOOD and CLEMENT, Circuit Judges, and RESTANI, Judge.[*]

RESTANI, J.:

Appellant Curtis Wharton ("Defendant") appeals his conviction for (1) the foreign murder

of a United States national in violation of 18 U.S.C. § 1119; (2) conspiracy to kill in a foreign

country in violation of 18 U.S.C. § 956; (3) fraud via interstate carrier in violation of 18 U.S.C. §

1341; (4) mail fraud in violation of 18 U.S.C. § 1341; and (5) wire fraud in violation of 18 U.S.C.

§ 1343. These convictions arose from the murder of Defendant's wife, Sheila Webb Wharton, in

Haiti and Defendant's subsequent efforts to collect the proceeds of life insurance policies for

which he was the beneficiary. We affirm.

_____

[*] Judge, U.S. Court of International Trade, sitting by designation.

## BACKGROUND

In 1998, Defendant worked for All American Insurance in Shreveport, Louisiana, along with Judy Nipper. Sometime before May 1998, an acquaintance showed Defendant a taped segment from a December 12, 1997 *Dateline NBC* episode discussing a life insurance fraud scheme whereby the perpetrators would obtain life insurance policies and then travel to Haiti to obtain a false Haitian death certificate for the insured in order to collect on the policies.

Later that year, Defendant and Sheila Webb began dating. Defendant's counsel concedes that "[he], together with his future wife, Webb, and friend Judy Nipper, discussed replicating this fraud scheme, and began obtaining life insurance policies on Webb's life in May 1998." Appellant's Br. at 11. Defendant and Webb also discussed the plan with her uncle, explaining that they intended to follow through with the plan because they had found someone who could "furnish them with a body." Defendant and Webb continued to obtain policies from May 1998 to October 1999, accumulating over $2 million in life insurance coverage on Webb. Defendant was listed as the primary beneficiary on the policies, and Nipper was the co-beneficiary on at least one policy. The monthly premiums on all policies were paid through an automatic bank draft from Defendant's checking account. Defendant and Webb were married in the Dominican Republic in September 1999. Four months later, Webb was murdered in Haiti.

Defendant and Webb traveled to Haiti for unknown reasons several times in September and November 1999, and twice in January 2000. Defendant later gave dubious or clearly false explanations for these trips including that: (1) he was a financial advisor to the Government of Haiti; (2) he was collecting investors to develop a Haitian resort; and (3) he needed to close on an

2

unsubstantiated Haitian loan. During the first trip to Haiti in September 1999, Webb and Defendant met Pierre Francois, a tour guide at a hotel in Petion-ville, Haiti, a suburb of Port-Au-Prince. Francois testified that Defendant and Webb asked him about obtaining a false passport on several occasions and that he eventually helped obtain one for Webb under the name "Gina Vincent." Francois identified Defendant as the man who paid for the false passport. Francois testified that Defendant gave him a business card with Nipper's phone number written on the back and instructed him to contact Nipper once the passport was ready. The passport, which was never delivered, and business card, with Nipper's phone number hand-written on the back, were recovered by Haitian police and presented as evidence at trial.

In early 2000, Defendant and Webb twice traveled to Haiti where a series of suspicious money transfers preceded Webb's murder. On January 5, 2000, Nipper wired Defendant $2,000. Eight days later, on January 13, Nipper wired $1,500. The following day, January 14, Nipper wired an additional $13,500 to Defendant. Webb was murdered in Haiti the next day, January 15, 2000.[1] She was shot on an isolated road outside of Port-Au-Prince. Two days after Webb's murder, Francois deposited $7,000.00, which he admits he obtained from Defendant, into his bank account.

Defendant's later accounts of the events surrounding Webb's murder were conflicting, but he generally explained that his car was attacked by two car-jackers on a motorcycle and that, when Webb would not get out of the car, the attackers shot her four times and threw her body to the ground. Defendant stated that one attacker fled in the car and the other on the motorcycle.

---

[1] An autopsy performed in the United States confirmed Webb's identity and the cause of death – four gunshots to the head and neck.

3

Upon arrival at the crime scene, the police noted that, although her purse had been emptied, Webb was still wearing jewelry. Defendant still had possession of his credit cards, passport, and other valuables. Webb's suitcase was discovered untouched in the allegedly stolen car found abandoned a few miles away. An autopsy revealed the presence of flunitrazepam, the active ingredient in rohypnol,[2] in Webb's urine sample. Upon searching Webb's suitcase, the Haitian police discovered rohypnol tablets in a bottle of Webb's medication labeled Ritalin, while the Ritalin tablets were found mixed in another bottle.

The Haitian National Police (HNP) began an investigation. They noted discrepancies and inconsistencies in Defendant's statements, but Defendant returned to the United States before the HNP could detain him. Upon his return, Defendant promptly hired an attorney and sought to collect the life insurance proceeds.

Following an FBI investigation, Defendant and Nipper were indicted on February 9, 2001, for (1) the foreign murder of a United States national in violation of 18 U.S.C. § 1119 (Count 1); (2) conspiracy to kill in a foreign country in violation of 18 U.S.C. § 956 (Count 2); (3) fraud via interstate carrier in violation of 18 U.S.C. § 1341 (Counts 3 & 4); (4) mail fraud in violation of 18 U.S.C. § 1341 (Counts 5-15); and (5) wire fraud in violation of 18 U.S.C. § 1343 (Counts 16-18). The prosecution's essential theory was that Defendant, Webb, and Nipper conspired to pull off the life insurance scheme discussed. The prosecutors believed that Webb eventually backed out of the plan to fake her death and that Defendant and Nipper then conspired with Pierre

---

[2] Rohypnol is a benzodiazepine and is commonly referred to as "roofies" or "the date rape drug." See DEA Resources, For Law Enforcement Officers, Intelligence Reports, Rohypnol, at http://www.usdoj.gov/dea/pubs/rohypnol/rohypnol.htm (last visited Jan. 15, 2003). Among other things, rohypnol causes dizziness, confusion, and memory impairment, the effects of which can last for up to eight hours or more. Id.

Francois to kill Webb in Haiti to collect on the insurance policies. Defendant pled not guilty to all charges.

Defendant's first trial began on June 19, 2001, but was terminated after direct examination of prosecution witness Yolanda Sepulvado.[3] Sepulvado testified that Nipper told her about a rat that Nipper and Defendant were using to test poison to determine whether it would kill Webb. The district court found that the testimony's prejudicial impact outweighed its probative value and excluded it under Federal Rule of Evidence 403. Defendant moved for a mistrial – for the fourth time in the first three days of testimony. The government opposed mistrial but, after substantial briefing, the court ultimately declared a mistrial on grounds that the statements were not in furtherance of the conspiracy charge and sufficiently prejudicial enough to warrant mistrial.

Defendant then moved to dismiss on double jeopardy grounds, arguing that the prosecution had actively sought mistrial. That motion was denied and a second trial commenced immediately thereafter on July 2, 2000. Defendant was convicted by the jury on all counts, and was sentenced to life imprisonment and ordered to pay a $2.5 million fine. The district court denied the post-verdict motion for new trial. Defendant is currently incarcerated.

This appeal followed.

## DISCUSSION

### I. Double Jeopardy

Defendant first argues that the district court erred in denying his motion to dismiss the case on double jeopardy grounds. Retrial is ordinarily allowed where the defendant moves for

---

[3] The district court granted Defendant's motion for a change of venue from Shreveport, Louisiana, to New Orleans due to adverse pretrial publicity, and also severed Nipper's trial.

mistrial.  Oregon v. Kennedy, 456 U.S. 667, 673 (1982).  In Kennedy, the Supreme Court analyzed the narrow circumstances under which a defense motion for mistrial nonetheless bars a retrial on double jeopardy grounds.  Id.  The Court recognized that retrial after a mistrial caused by prosecutorial misconduct may constitute double jeopardy if "the government [] conduct in question [was] intended to 'goad' the defendant into moving for a mistrial . . . ."  Id. at 676 (emphasis added).

In Kennedy, the Court made it clear that prosecutorial misconduct alone is not sufficient for a retrial to result in a double jeopardy violation:  "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause."  Id. at 675-76 (emphasis added).  Retrial is not barred even where the prosecution engages in "intentional misconduct that seriously prejudices the defendant."  See United States v. Singleterry, 683 F.2d 122, 123 n.1 (5th Cir. 1982).  Once the court determines that the prosecutor's conduct was not intended to terminate the trial, "that is the end of the matter for purposes of the Double Jeopardy Clause of the Fifth Amendment . . . ."  Kennedy, 456 U.S. at 679.

Defendant claims that the prosecution's case against him was "on the ropes" and that the prosecution purposely elicited prejudicial hearsay evidence from Sepulvado so that Defendant's counsel would be forced, i.e. "goaded," into seeking a mistrial.  If true, this would support Defendant's double jeopardy claim.  See, e.g., United States v. Lun, 944 F.2d 642, 644 (9th Cir. 1991) (considering "whether the government's case was going badly causing the prosecutor to fear acquittal" as potential evidence of intentional provocation);  United States v. Oseni, 996 F.2d

6

186, 187 (7th Cir. 1993) (same).

Review of the record shows that the prosecution's case was not nearly as weak as Defendant suggests. For example, while the court struck Sepulvado's comments regarding the rat, the court initially allowed several of Sepulvado's other incriminating statements, including testimony that Nipper told Sepulvado that: (1) the Wharton, Nipper, and Webb had devised a scheme to fake Webb's death; (2) Webb was going to "hide out" in the Caribbean; (3) Defendant had obtained a false death certificate already; (4) Webb was backing out of the scheme; and (5) Nipper would get half of the proceeds.[4] This, in conjunction with the other factual evidence discussed, establishes a convincing case against Defendant.

We note that Defendant actually moved for mistrial on four different occasions, suggesting that it was Defendant, not the prosecution, that was "on the ropes." The prosecution opposed mistrial in every instance, particularly with respect to the testimony of Sepulvado. In opposition to mistrial, the government raised its concerns about the availability of various Haitian witnesses who were beyond subpoena power and in court voluntarily. The government certainly did not stand to benefit from any delay in the proceedings. We find that Defendant has not shown that prosecution affirmatively sought mistrial.

## II.     Constitutionality of 18 U.S.C. § 1119

Defendant next argues that the foreign murder statute, 18 U.S.C. § 1119, is unconstitutional as applied to him. Subsection (c)(2) of 18 U.S.C. § 1119 provides that:

---

[4] Defendant also claimed that the admission of Pierre Francois, a key prosecution witness, that he lied to the F.B.I. was fatally damning to the prosecution's case. It was, however, Defendant that moved for a mistrial, or alternatively to strike Francois' testimony, on grounds that the his statements were overly prejudicial.

7

> No prosecution shall be approved under this section unless the Attorney General, in consultation with the Secretary of State, determines that the conduct took place in a country in which the person is no longer present, and <u>the country lacks the ability to lawfully secure the person's return</u>. A determination by the Attorney General under this paragraph is not subject to judicial review.

<u>Id.</u> (emphasis added). Defendant argues that because the United States and Haiti have a valid extradition treaty, the statute is inapplicable to him.[5]

The statute, however, clearly states that the Attorney General's determination on this issue is not subject to review. Defendant argues that the prohibition against judicial review violates his Fifth Amendment due process rights here because the Attorney General's determination was erroneous. Defendant contends that the Attorney General should not be permitted to make a determination that a person is beyond the reach of the foreign country when facts establish that the country could secure his return. The Government responds that the Attorney General's determination is not an element of the crime and, therefore, does not raise Fifth Amendment due process concerns. We agree.

The Fifth Amendment to the U.S. Constitution provides that "no person shall . . . be deprived of life, liberty, or property without due process of law." The Supreme Court has repeatedly held that "th[is] provision[] require[s] criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged,

---

[5] Defendant does not argue that the statute does not generally apply to the crime. 18 U.S.C. § 1119(b) provides:

> A person who, being a national of the United States, kills or attempts to kill a national of the United States while such national is outside the United States but within the jurisdiction of another co untry shall be punished as provided under sections 1111, 1112, and 1113.

Defendant, a U.S. national, was charged with the murder of a U.S. national in Haiti.

8

beyond a reasonable doubt." United States v. Gaudin, 515 U.S. 506, 510 (1995) (citing Sullivan v. Louisiana, 508 U.S. 275, 277-78 (1993); see also Ring v. Arizona, 122 S. Ct. 2428, 2439 (2002), Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). Defendant argues that the determination described in § 1119(c)(2) is an essential element of the crime of foreign murder and, therefore, creates a factual issue for which proof must be introduced and a factual determination made.

Section 1119 is brief and divided into three subsections. Subsection (a), titled "Definition," simply defines a "national of the United States." See 18 U.S.C. § 1119(a). Subsection (b), titled "Offense," provides the essential elements of foreign murder:

> [1] A person who, being a national of the United States, [2] kills or attempts to kill [3] a national of the United States [4] while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113.

18 U.S.C. § 1119(b) (incorporating by reference the elements of the federal murder, manslaughter, and attempted murder statutes).

Subsection (c), titled "Limitations on prosecution," separately identifies two qualifications on foreign murder prosecutions. The first requires that the Attorney General, Deputy Attorney General, or Assistant Attorney General approve prosecution. 18 U.S.C. § 1119(c)(1). Subsection (c)(1) also provides that no prosecution shall be approved if another country is prosecuting the defendant for the same conduct. Subsection (c)(2) similarly provides that no prosecution shall be approved unless the Attorney General determines that the country in which the murder took place lacks the ability to secure the defendant's return. The structure of the statute suggests that Congress intentionally separated these two limitations from the offense

9

identified in subsection (b).

When viewed in context, these limitations refer to the Attorney General's decision to approve prosecution for foreign murder, a decision equivalent to the general exercise of prosecutorial discretion. In United States v. White, 51 F. Supp. 2d 1008, 1012 (E.D. Cal. 1997), the court faced a similar question. There, the defendant was also charged under the foreign murder statute and argued that, because Japan had the ability to secure the defendant's return under an extradition treaty, the Attorney General's determination was unreasonable. The court refused to review that determination, upholding the statute's prohibition against judicial review:

> The judgment of Congress to insulate the determination from judicial review is consistent with the general proposition that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). Congress was well within its authority to repose the determination to prosecute exclusively with the Attorney General. Thus, the Court will not review whether the Attorney General correctly concluded that Japan could not lawfully secure Defendant's return.

White, 51 F. Supp. 2d at 1012. While not binding, we find White persuasive.[6] We conclude that the statutory structure suggests that Congress intentionally separated the Attorney General's prosecutorial decisions from the elements of the crime.

In Apprendi, however, the Supreme Court recognized that the essential elements of a crime may include factual determinations that are not necessarily described as offense elements in

---

[6] In United States v. Nipper, 198 F. Supp. 2d 818, 820 (W.D. La. 2002), Defendant's co-conspirator similarly argued that only a country without an extradition treaty "lacks the ability to lawfully secure the person's return" as required by § 1119(c)(2). Without reviewing the due process implications, the court upheld the statutory prohibition against judicial review and refused to dismiss Nipper's foreign murder charge. Id. at 821 ("When applying criminal laws, courts must follow the plain and unambiguous meaning of the statute.") (citing Garcia v. United States, 469 U.S. 70, 75 (1984)).

the statute. 530 U.S. at 495 ("[M]erely because the state legislature placed its hate crime sentence 'enhancer' within the sentencing provisions of the criminal code does not mean that the finding of biased purpose to intimidate is not an essential element of the offense."). Apprendi's recognition of statutorily separate offense elements is inapplicable here for two reasons. First, the determination under § 1119(c)(2) does not involve the resolution of a question of fact, but rather a complicated determination of fact and law combined with prosecutorial considerations.[7] Second, the determination does not increase the maximum sentence for the crime of foreign murder. Because Congress has not made this determination an element of the offense and because the determination is not otherwise equivalent to an offense element, we find that preclusion from judicial review under § 1119(c)(2) does not violate Defendant's due process rights under the Fifth Amendment. As such, we will not review the Attorney General's determination here.

---

[7] This particular determination may require that the Attorney General, in consultation with the Department of State, review the terms of an extradition treaty to assess its application to the particular case. "It is well established that, under the international principle of specialty, an extradited defendant may not be tried for a crime not enumerated in the applicable extradition treaty." United States v. Campbell, 300 F.3d 202, 209 (2d Cir. 2002) (citing United States v. Rauscher, 119 U.S. 407, 424 (1886); United States v. Flores, 538 F.2d 939, 944 (2d Cir. 1976)). In addition, the Attorney General might review the laws and legal system of the foreign nation to determine whether prosecution is possible in that country. Even if prosecution were possible, speculating as to whether the United States will actually extradite an individual to that country is another complicated matter in itself. "[T]he question of whether an extradition treaty allows prosecution for a particular crime that is specified in the extradition request is a matter for the extraditing country to determine." Campbell, 300 F.3d at 209 (citing Johnson v. Browne, 205 U.S. 309, 316 (1907)). In short, determining whether a country has the ability to secure a defendant's return involves more than finding that a treaty exists. The crux of Apprendi is that any "fact" that increases the maximum penalty must be proven. 530 U.S. at 489. Because this determination requires a multifaceted and subjective evaluation by the prosecutor rather than the resolution of a question of fact, Apprendi is inapplicable here.

11

Defendant alternatively argues that, because the foreign murder statute creates an offense that may be punishable by death if the accused refuses to consent to return to the country in which the alleged offense occurred, the statute exacts an unconstitutional punishment. Defendant argues that the imposition of more severe criminal penalties as a result of the theoretical invocation of his constitutional right to challenge extradition "transgresses" due process protections. As Defendant openly acknowledges, the government did not seek the death penalty in this case, therefore, he does not have standing to appeal on those grounds. See Rivera v. Wyeth-Ayerst Labs, 283 F.3d 315, 318 (5th Cir. 2000) (explaining that an "injury in fact" is an essential element of standing under Art. III of the Constitution).

## III.    Juror Bias

Defendant next appeals the district court's denial of his challenge to excuse a juror for cause who Defendant claims admitted bias in favor of the prosecution during voir dire. The standard for determining whether a proposed juror may be excluded for cause is "whether the prospective 'juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Soria v. Johnson, 207 F.3d 232, 242 (5th Cir. 2000) (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)). The appellate court reviews the district court's ruling on jury impartiality for "manifest abuse of discretion." United States v. Munoz, 15 F.3d 395, 397 (5th Cir. 1994).

Defendant points to one potential juror's statement that his experience as the victim of a stabbing "could" affect his ability to be impartial. Defendant also cites to other statements by that potential juror, including several to the effect that, because his stepfather was a policeman, he "could not honestly say [he] would not take law enforcement's side." Upon further questioning,

12

the potential juror stated that he felt that he could take the oath and follow the law with respect to the evidence as given by the judge. Defendant moved to excuse the juror for cause. The district court denied that request, noting the juror's statement that he could follow the court's instructions. Defendant then used one of his peremptory challenges to excuse that juror. Defendant argues that the use of its peremptory challenge on this potential juror "resulted in the service of a deliberating jury who would have otherwise been excluded by the defense."

A district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial. United States v. Martinez-Salazar, 528 U.S. 304, 313-18 (2000) (holding that "a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause."). Defendant suggests that the jury panel was not impartial because the personality of one juror "severely clashed with defense counsel at voir dire, thus, generating a personal animus against the defendant and defense team." Appellant's Response Br. at 15. Defendant does not, as required, argue that the juror was otherwise incompetent or cite to any relevant record testimony illustrating any "animus" or provide other reliable evidence that the jury was actually biased by her addition. Defendant's claim here is spurious. We find that the district court did not abuse its discretion in this regard.

## IV. Evidence

Defendant next claims that the evidence brought against him does not support his convictions for murder, murder conspiracy, and fraud. In reviewing the sufficiency of the evidence, the court must view all evidence and make all inferences drawn from that evidence in

13

the light most favorable to the prosecution to determine whether a reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. United States v. Greenwood, 974 F.2d 1449, 1456 (5th Cir. 1992) (discussing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

### A.     Venue

Defendant argues that the prosecution did not properly establish venue for the purposes of 18 U.S.C. § 1119. Article III of the Constitution, the Sixth Amendment, and Rule 18 of the Federal Rules of Criminal Procedure guarantee that a defendant will be tried in the state where the crime was committed. U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; Fed. R. Crim. P. 18. "[A]ll offenses begun or committed . . . out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is arrested or is first brought." 18 U.S.C. § 3238. Webb was murdered in Haiti and Defendant was arrested in Fort Myers, Florida, therefore, Defendant argues that venue properly rests with the Middle District of Florida.

At the time of Wharton's arrest in Florida on September 9, 2000, prosecutors had filed a complaint in the Western District of Louisiana against Defendant and Nipper on insurance fraud charges in violation of 18 U.S.C. § 1341. It is important to note that Defendant was not yet charged with foreign murder. After an initial hearing in the Middle District of Florida, Defendant was detained and returned to Shreveport, Louisiana. On September 25, 2000, a grand jury sitting in the Western District of Louisiana indicted Defendant and Nipper on conspiracy, mail fraud, and wire fraud charges. On February 9, 2001, while Wharton was in the custody of the Western District of Lousiana, the grand jury indicted Defendant and Nipper in a superseding indictment

14

charging one count of foreign murder of a U.S. national, in addition to the previous charges.[8]

Defendant's venue challenge fails because Wharton was not "arrested" on the foreign murder charge until he was in Louisiana.

> "[T]he purpose of the venue statute [18 U.S.C. § 3238] is not to fix the place of arrest but simply to have the place of trial conform to the place of arrest." United States v. Provoo, 215 F.2d 531, 538 (2d Cir. 1954). Courts consistently have interpreted "arrested" in § 3238 to mean that "venue is in that district . . . where the defendant is first restrained of his liberty in connection with the offense charged." United States v. Erdos, 474 F.2d 157, 160 (4th Cir.), cert. denied, 414 U.S. 876 (1973) (emphasis added).

United States v. Catino, 735 F.2d 718, 724 (2nd Cir. 1984). In Catino, the Defendant was first arrested in the Eastern District of New York on narcotics trafficking charges. He was further restrained after those charges were dropped so that he could be transferred to the Southern District of New York to begin serving a previous sentence. Already in custody at the Metropolitan Correctional Center of the Southern District, the defendant then was indicted and arraigned for passport violations. The court found that "[i]t is irrelevant that the government could have charged Catino in the Eastern District for the passport charge, as the statute does not dictate the place of arrest. Since the Southern District was the district where Catino was actually restrained in connection with the passport charge, venue lay exclusively within that district." Catino, 735 F.2d at 724 (citation omitted). We find this situation analagous. The Western District of Louisiana is the district where Wharton was "first restrained" on the foreign murder charge and, therefore, venue properly rests in that district.[9]

---

[8] The court granted Defendant's motion for a change of venue from Shreveport to New Orleans and trial began there on June 19, 2001.

[9] Our conclusion makes it unnecessary to consider whether Defendant waived his present venue claim by failing to properly raise the issue – in his motion for change of venue or

15

**B.      Murder, Conspiracy, Wire Fraud**

Defendant next argues that the circumstantial evidence failed to prove that he was involved in Webb's murder.  Defendant further argues that there is an absence of any proof that he conspired with Nipper to kill Webb, or that any overt act in furtherance of the murder conspiracy occurred in the United States.  Also, Defendant argues that there was no evidence that (1) he submitted or authorized the submission of documents in furtherance of a fraud scheme to fake the death of Webb; or (2) that the wire transfers to Haiti were done in furtherance of a scheme to collect insurance proceeds by faking Webb's death.  Defendant essentially attacks each finding by the jury.

Defendant's counsel concedes that he, Webb, and Nipper discussed replicating the life insurance fraud scheme.  Appellant's Br. at 11.  Defendant's counsel concedes that he took out several life insurance policies on Webb, with Nipper as the co-beneficiary on at least one.  Id. Defendant's counsel concedes that he then took several trips to Haiti with Webb where they met Pierre Francois and arranged to obtain a false passport.  Id.  Defendant's counsel concedes that he had several thousand dollars wired to Haiti for unspecified purposes.  That Webb was actually killed in Haiti after the money was wired does not seem coincidental.  When combined with the inconsistent stories by Defendant, the circumstances of the alleged "carjacking," and the flunitrazepam found in Webb's system, we find that a reasonable jury could have found that Defendant was involved directly in the murder of his wife.

---

otherwise.  See, e.g., United States v. Delgado-Nunez, 295 F.3d 494, 497 (5th Cir. 2002) ("'venue objections are waived unless made prior to trial' in all cases except 'when an indictment contains a proper allegation of venue so that the defendant has no notice of a defect of venue until the government rests its case.'") (quoting United States v. Black Cloud, 590 F.2d 270, 272 (8th Cir. 1979)).

16

Defendant next argues that there was insufficient evidence to establish a conspiracy between him and Nipper to murder Webb. To obtain a conviction for conspiracy to kill in a foreign country, the government must prove that: (1) the defendant agreed with at least one person to commit murder; (2) the defendant willfully joined the agreement with the intent to further its purpose; (3) during the existence of the conspiracy, one of the conspirators committed at least one overt act in furtherance of the object of the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when the agreement was made. See 18 U.S.C. § 956. In addition to other evidence discussed herein, Nipper, a co-beneficiary on at least one of the policies, wired $15,000 to Defendant in Haiti in the two days before Webb's murder. A reasonable jury certainly could have found that the $15,000 was used to fund the murder and that Nipper understood the purpose of those funds when she wired them to Defendant from the United States. We find no error with respect to Defendant's conspiracy conviction.

Defendant next challenges the mail and wire fraud convictions. All the prosecution need show here is that the defendant participated in a fraudulent scheme and used interstate mail or wire facilities to further the scheme. See 18 U.S.C. § 1343, United States v. Odiodio, 244 F.3d 398, 403 (5th Cir. 2001). Defendant associated a law firm for the purpose of fraudulently collecting the insurance proceeds. The mailings sent by the law firm on Defendant's behalf constitute use of interstate mail to further fraud because Defendant "act[ed] with the knowledge that the use of the mails [would] follow in the ordinary course of business." United States v. Green, 964 F.2d 365, 369 (5th Cir. 1992). A reasonable jury could determine that Defendant anticipated that his lawyers would send letters to collect on the insurance policies. Defendant's argument that the three wire transfers to Haiti were not in furtherance of the scheme is simply

17

disingenuous.  As discussed, a reasonable jury could find that the purpose of those transfers was to fund the murder.  Viewing the evidence in the light most favorable to verdict, we find that a reasonable trier of fact could have found that the evidence established Defendant's guilt on all charges beyond a reasonable doubt.

## V.      Prosecution's Comments on Defendant's Silence

Finally, the defense argues that a new trial is warranted because the prosecution made improper comments to the jury regarding Defendant's invocation of his Fifth Amendment right to remain silent.  A defendant's Fifth Amendment right to remain silent is well established.  A prosecutor is prohibited from commenting directly or indirectly on a defendant's failure to testify or produce evidence.  See Griffin v. California, 380 U.S. 609 (1965); see also United States v. Montoya-Ortiz, 7 F.3d 1171 (5th Cir. 1993) (holding that the Constitution prohibits "direct and indirect references to a defendant's silence.").  "The test for determining if a constitutional violation has occurred is whether 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'"  United States v. Rocha, 916 F.2d 219, 232 (5th Cir. 1990) (quoting Davis v. United States, 357 F.2d 438, 441 (5th Cir.), cert. denied, 385 U.S. 927 (1966)), cert. denied, 500 U.S. 934 (1991).  "[T]he comments complained of must be viewed within the context of the trial in which they are made."  United States v. Dula, 989 F.2d 772, 776 (5th Cir. 1993).

In closing, the prosecution stated "[t]hroughout the whole trial you have still not heard why.  Ladies and gentleman, there is no innocent why.  There is no innocent why for this form and those numbers and the bill breakdown."  Defendant argues that the prosecution's statement was an improper reference to Defendant's silence. Almost immediately after the statement, the district

18

judge instructed the jury on Defendant's right to remain silent. "Mr. Owen, let me instruct the jury. The law never requires a defendant to prove anything or to produce any evidence, and no inference may be drawn from the election of a defendant not to testify." Defendant argues that the district court recognized that the prosecution's statements were capable of being improperly weighed by the jury at deliberations. The context of the instruction suggests that the court was attempting to cure what may have been a veiled reference at Defendant's silence.

The Government argues that the prosecution was simply responding to defense counsel's statements. Throughout closing and rebuttal arguments, defense counsel repeatedly suggested to the jury that the prosecution had not explained "why" Defendant would commit this crime. For example: (1) "If he wanted to arrange a murder, why would he be there? Why? Why would he add all these problems?"; (2) "Why would he do all of that if it was for murder? It wasn't. [Webb] knew about the money."; (3) "So why, if he's plotting to kill her, does he do this short of two years?" The Government argues that its statement that "there is no innocent why" was a direct response to those questions, keying on the specific term repeatedly emphasized by defense counsel.

It is possible that prosecution was attempting to respond properly to defense counsel's closing argument. It is also possible that the prosecution was, at the same time, pointing out that Defendant had not made himself available to answer such questions. At best, it is unclear what the prosecution intended or what the jury would perceive from the comment. The court's quick instruction in this ambiguous situation sufficiently eliminated any threat of the potential burden-shifting or prejudice that Defendant alleges.

AFFIRMED.

19