IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 15, 2008

Charles R. Fulbruge III
Clerk

No. 07-20833

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JAMES MACEO RAMEY, also known as James M Ramey,
also known as Bob Ramey, also known as Joe Hill, also
known as Bill Smith, also known as Shaun Miller

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:04-CR-188-1

Before JOLLY, BARKSDALE, and HAYNES, Circuit Judges.

PER CURIAM:[*]

A jury convicted James Maceo Ramey of passport fraud and obstruction of justice. Alleging various errors, Ramey appeals. We AFFIRM.

FACTS

James Ramey became what is known as a serial bankruptcy filer. Ramey would file for bankruptcy and, after a creditor had the automatic stay lifted to

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

foreclose on Ramey's property, he would file a new bankruptcy petition to impose a new automatic stay. This resulted in at least 14 bankruptcies in different states across the country. The facts here arise from the four bankruptcies he filed in the Southern District of Texas; these four bankruptcies were consolidated into one case. After Ramey failed, for the third time, to appear at a court-ordered hearing in that case, the bankruptcy judge issued a warrant for his arrest on August 27, 2003.

U.S. Marshals tried to arrest Ramey at his home on October 23. There they met with Ramey's wife, who first stated that she did not know James Ramey, but later stated that he was out of the country. Marshals also spoke with Ramey's son. When shown a photo of James Ramey, he at first denied knowing him, but later stated the man in the photo was his uncle. When pressed, he said his father was out of the country.

The bankruptcy judge subsequently subpoenaed Ramey's family to answer questions as to Ramey's whereabouts. On November 19, a group of marshals went to Ramey's home to serve Ramey's wife and son with the subpoenas. While another marshal knocked on the door, two marshals walked behind the house. They saw through sliding glass doors two crouching figures run down a hallway. Ramey's wife then answered the door and told the marshals that Ramey was out of the country for an extended period of time. Ramey's son told them that he did not know where his father was. The marshals served them with the subpoenas and asked for consent to search, which was given. They eventually found Ramey hiding inside an air-conditioning duct, behind a vent that had been screwed shut from the outside. They arrested him without incident.

On the basis of Ramey's violation of court orders and failure to comply with bankruptcy reporting requirements, the bankruptcy judge issued an order authorizing the bankruptcy trustee to seize all assets, books, and records at Ramey's home. On November 25, counsel for the trustee, accompanied by

marshals, executed the order. At Ramey's home they found a locked safe for which only Ramey knew the combination. Because Ramey had not yet been released, counsel called a locksmith to open the safe. Inside she found eight passports, five of which she seized. These included two expired passports issued in the names of Henry Ramey and Ron Ramey, two expired passports issued in the name of James Ramey, and one unexpired passport issued in the name James Ramey.

Ramey was released on bond on November 27. On December 5, he submitted an application for a new passport in which he stated, under oath, that his previously issued passport had been lost. In addition he submitted a letter dated December 1 signed by Mary Abernathy, as chief executive officer of "Manhattan Gold, Inc." It stated that James Ramey, Manhattan Gold's chief operating officer, needed to travel to Europe on business the following week and urged that his application be expedited. The letter, which was on Manhattan Gold letterhead, listed as its return address the address of property that Ramey had recently owned but lost in a foreclosure. On December 10, a new passport was issued to James Ramey.

Meanwhile counsel for the bankruptcy trustee turned over the seized passports to the United States Attorney's Office, which passed them on to the Department of State. There Special Agent David Farrington investigated and discovered that in Ramey's recent application for a new passport he had falsely stated that his previous passport had been lost. He also discovered that the letter that accompanied Ramey's application had been fabricated.

On April 19, 2004, Ramey was charged with passport fraud. The next day, agents from the Department of State and the FBI arrested Ramey at his home and executed a search warrant for the newly issued passport.

On July 19, a superseding indictment was filed charging Ramey in counts 1-3 with having made false statements in connection with his passport

application and in counts 9, 11, and 12 with obstruction of justice for trying to conceal himself from marshals on November 19. A jury found him guilty on each of these counts.

## ANALYSIS

### I.

Ramey contends the district court erred in denying his motion for mistrial after comments by two government witnesses drew attention to the fact that Ramey had exercised his Fifth Amendment right to silence. Relatedly, he contends the district court should have granted a mistrial after the prosecutor referred to certain facts as "uncontroverted" during his closing argument.

It is well-established that at trial the government may not comment on the fact that a defendant has exercised his right to silence. See Doyle v. Ohio, 426 U.S. 610, 617-18 (1976).[1] But not all such comments violate the Fifth Amendment. The test for determining whether a comment violates the Fifth Amendment is whether the language used was (1) "manifestly intended" or (2) "of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Wharton, 320 F.3d 526, 538 (5th Cir. 2003) (quoting United States v. Rocha, 916 F.2d 219, 232 (5th Cir. 1990)).

This court reviews such comments in context, and they "must have a clear effect on the jury before reversal is warranted." Rocha, 916 F.2d at 232. The doctrine of harmless error applies to this standard: a comment that is otherwise impermissible will not warrant reversal if, beyond a reasonable doubt, it did not contribute to the jury's verdict. United States v. Moreno, 185 F.3d 465, 475 (5th Cir. 1999). Furthermore, we have recognized the power of curative instructions,

---

[1] The identity of the speaker is not dispositive. See United States v. Rocha, 916 F.2d 219, 232 n.10 (5th Cir. 1990) (citing United States v. Shaw, 701 F.2d 367, 381 n.8 (5th Cir. 1983), cert. denied, 465 U.S. 1067 (1984)).

which can "militate against finding a constitutional violation, or become central to the harmless error analysis." Id. at 477 (citing Greer v. Miller, 483 U.S. 756, 764 (1987); United States v. Carter, 953 F.2d 1449, 1466 (5th Cir. 1999)).

We reproduce below the relevant portions of the two agents' testimony and the prosecutor's closing statements, and then decide in turn whether the comments at issue warrant reversal.

A.    Agents' testimony

David Farrington of the State Department and Ben Stone of the FBI both helped execute the April 20, 2004, search warrant. Both testified at trial that Ramey was present and that they interviewed him. The parties do not dispute that Ramey was advised of his right to silence.

Agent Farrington testified on direct examination that Ramey told him that Ramey had possessed no passports in the last six months, but that he had applied for a passport within the past year. Farrington testified that when he asked Ramey what had happened to his last passport, Ramey initially stated that it had been lost, but later stated it may have been seized. The prosecutor then asked Farrington:

> Q:    "Did you have any other discussions with Mr. Ramey that day at his house, the day of the search?"
>
> A:    "Just – I asked him some more questions that he didn't answer."

Ramey's counsel objected, and the court instructed the prosecutor to move to another area of questioning.

Later, on cross-examination, Ramey's counsel tried to impeach Farrington's credibility by showing that at two prior hearings Farrington had testified differently as to whether Ramey had told him that he had applied for a passport within the past six months, not within the past year. Ramey's

5

counsel produced the transcript of Farrington's testimony at a detention hearing at which Farrington had testified that Ramey had told him that he had applied for a passport within the past six months. Farrington called this testimony a mistake. Ramey's counsel then produced the transcript of Farrington's testimony at a motion hearing. The following exchange occurred:

> Q:  I'm going to show you the motion hearing . . . and have you start looking at about line 14 on down.
>
> A:  How far do you want me to go, sir?
>
> Q:  As far as you think is relevant.
>
> A:  Where I say: "If I saw my notes of the interview, I could tell you exactly for sure" –  there was a question on line 10 on page 158 where it says: "And that's when he said 'I'm going to take the Fifth or something along those lines.'"

(Emphasis added.)

Ramey's counsel objected and moved for mistrial. The district court overruled the motion for mistrial, but instructed the jury to disregard the statement.

Thereafter Agent Stone testified. On direct examination he stated that he seized from Ramey's home a credit card and a receipt for a $145 payment Ramey made to the Department of State on the date Ramey applied for a new passport. Stone and the prosecutor then shared the following exchange:

> Q:  Now I'm going to ask you a series of questions and I want you to be careful of your answers. All right?
>
> A:  All right.
>
> Q:  Did you discuss business records with – of Manhattan Gold with Mr. Ramey?

6

> A:     We asked if he would be willing to provide us with some of those records about Manhattan Gold, and he decided not to.

(Emphasis added.)

Ramey's counsel objected and moved for a mistrial. The district court again overruled the motion for a mistrial, but instructed the jury to disregard the statement.

We cannot say that the two agents' testimony on direct was such that a jury would necessarily interpret their statements to be comments on Ramey's failure to testify. As to Agent Farrington's statement, it is obvious that the prosecutor was examining Farrington as to the discussion he had with Ramey before Ramey invoked his right to silence. Farrington had just testified that Ramey had answered certain questions. The prosecutor then asked whether Farrington and Ramey had "any other discussions" that day; he did not attempt to elicit testimony that Ramey had invoked his right to silence. Thus, the language used was not "manifestly intended." Wharton, 320 F.3d at 538. Nor does Farrington's statement itself – "Just – I asked him some more questions that he didn't answer." – appear to be of the kind a jury "would naturally and necessarily take . . . to be a comment on the failure of the accused to testify." Id. For the same reasons, Agent Stone's statement that they asked Ramey to provide them business records "but he decided not to" does not violate the Fifth Amendment. We note that in this instance the prosecutor actually cautioned Stone to "be careful of your answers"; he clearly did not manifestly intend to elicit Stone's response. Nor does Stone's statement have the clear effect of drawing attention to the fact that Ramey invoked his right to silence. We find that these portions of the agents' testimony on direct do not constitute constitutional violations.

Nor can we say that Farrington's testimony on cross warrants reversal. Although Farrington read aloud from the transcript that Ramey had said, "I'm going to take the Fifth or something along those lines,'" he was prompted by Ramey's counsel, who instructed him to read "[a]s far as you think is relevant." Under these circumstances, Ramey's counsel opened the door to Farrington's testimony. We cannot say that Farrington "manifestly intended" to comment on Ramey's invocation of his right to silence. At any rate, even assuming a constitutional violation, any effect the testimony may have had on the jury was cured by the district court's instruction to disregard the statement. Moreno, 185 F.3d at 475. The error, if any, was harmless.

B.    Prosecutor's closing argument

During closing argument the prosecutor summarized the evidence supporting obstruction-of-justice count 12, which charged Ramey with causing someone else to screw closed the air conditioning duct's vent while Ramey hid inside. The prosecutor recounted testimony that the vent was necessarily screwed shut from the outside, as there was only one entry into the vent and the vent's filter had been replaced behind its grill. He expressed doubt as to whether it was possible for someone to screw the vent closed from the inside. He then stated:

> Your question is: Is it reasonable to believe under all of the circumstances that you've heard, under all of the facts that are uncontroverted, about where he was, where he was found, what were the circumstances of that finding – is it reasonable to believe that someone did it from the inside as opposed to the outside?

(Emphasis added.)

Ramey alleges the statement – "under all of the facts that are uncontroverted" – was an indirect comment on his choice to exercise his right to silence. We disagree. Our precedent holds that "[t]he prosecutor's intent is not

manifest if there is some other, equally plausible explanation for the remark." United States v. Grosz, 76 F.3d 1318, 1326 (5th Cir. 1996). Here, the plausible explanation for the prosecutor's statement is that it sought to point out that Ramey had failed to dispute evidence that the vent had been screwed closed from the outside. Such commentary is not constitutionally impermissible. See id.; United States v. Guzman, 781 F.2d 428, 432 (5th Cir. 1986) ("[T]he government may comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence.").

Nor was the statement such that the jury would interpret it to be a comment on Ramey's refusal to testify. And as the district court noted, the jury was amply instructed that Ramey had no burden to put on evidence. Accordingly, we conclude the prosecutor's closing statements did not violate the Fifth Amendment. The district court did not err in denying Ramey's motion for mistrial.

## II.

Ramey contends the district court erred in admitting evidence of his bankruptcy filings. Before trial, Ramey filed a motion in limine to exclude any evidence of the pending bankruptcy-fraud investigation. The district court concluded, however, that the evidence was admissible to establish context for the passport fraud and obstruction of justice charges. As a result, the jury heard testimony that: (1) Ramey's four pending bankruptcies were converted from Chapter 13 to Chapter 7 because he never filed schedules; (2) Ramey filed 15 bankruptcies between 2001 and 2005; and (3) a judge found that, although he denied it, Ramey had in fact filed the first three bankruptcies.

Citing neither a standard of review nor authority, Ramey contends that the evidence was highly prejudicial. Although we find his brief inadequate, we nonetheless review this issue and conclude it is without merit.

We review a district court's decision to admit or exclude evidence for abuse of discretion. See, e.g., United States v. Jimenez, 509 F.3d 682, 692 (5th Cir. 2007). Nevertheless, even where we find abuse of discretion, we will not reverse a conviction absent a showing of substantial prejudice. Id. Here we need not decide whether the district court in this case abused its discretion, since Ramey merely alleges prejudice, not substantial prejudice. Moreover, in light of the overwhelming evidence supporting Ramey's conviction, we conclude that prejudice, if any, from this specific evidence of Ramey's bankruptcy fraud was not substantial. See United States v. Nguyen, 504 F.3d 561, 573 (5th Cir. 2007) (any error in admission of witness testimony harmless in light of strength of government's case against defendant). Accordingly, we reject Ramey's request for a new trial.

### III.

Ramey contends the district court should have severed the obstruction of justice and passport fraud counts. Although his brief does not mention it, we see from the record that Ramey filed a motion to sever with the district court, and that it was denied. We review the denial of a motion to sever for abuse of discretion. See, e.g., United States v. Morrow, 177 F.3d 272, 292 (5th Cir. 1999).

Federal Rule of Criminal Procedure 8 permits joinder of offenses that are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Under Federal Rule of Criminal Procedure 14(a), a court may sever offenses if their joinder "appears to prejudice a defendant." When deciding whether severance is appropriate, a district court should balance any prejudice to the defendant against the interests of judicial economy. United States v. Ballis, 28 F.3d 1399, 1408 (5th Cir. 1994).

First, we note that joinder here was proper. Although the joined offenses – obstruction of justice and passport fraud – arise from separate events, they are

clearly connected by the same set of underlying facts. Ramey is charged with obstruction of justice because he hid from agents who tried to arrest him for his failure to comply with several bankruptcy orders. At about the same time, the bankruptcy court issued an order to impound Ramey's property. On the basis of this order, agents seized Ramey's assets and his passport. Days later, when Ramey applied for a new passport, he falsely stated that his passport was lost; for this and other misrepresentations he is charged with passport fraud. The relatedness of the facts here is indisputable. In United States v. Davis, 752 F.2d 963 (5th Cir. 1985), a case Ramey cites, joinder of obstruction of justice and mail fraud offenses was not improper where the facts necessary to each created "a substantial overlap of the evidence." Id. at 972. In the light of that overlap we concluded in Davis that judicial economy militated against separate trials. Id. Under the same principle, judicial economy militates against separate trials here. Joinder was proper.

Next, we note that Ramey was not prejudiced by joinder. Ramey argues joinder was prejudicial merely by suggesting that as a result of joinder the jury heard evidence for both offenses that otherwise may have been inadmissible. But, again, the relatedness of the facts here makes it plain that the same facts admissible to prove obstruction of justice would have been admissible in a separate trial for passport fraud to prove, for example, knowledge or absence of mistake or accident under Federal Rule of Evidence 404(b). We see no prejudicial spillover effect here; Ramey was not prejudiced by joinder. The district court did not abuse its discretion in denying Ramey's motion to sever.

## IV.

Ramey alleges the Government unlawfully relied on an order to impound property issued by a bankruptcy court to search his home and seize his passports. He cites only G.M. Leasing Corporation v. United States, 429 U.S.

11

338 (1977), to argue that counsel to the trustee violated his Fourth Amendment rights when, without a warrant, she seized passports she found in his safe.

The government argues that we lack subject matter jurisdiction to review this issue because the impound order arose in Ramey's bankruptcy case, and under 28 U.S.C. § 158(a) the district courts have jurisdiction over appeals of bankruptcy matters. The government posits that we would have jurisdiction only if the district court had reviewed and ruled on this issue. The government points out that there is no evidence that the bankruptcy court itself ruled on whether the passports were properly seized, much less evidence that the district court reviewed such ruling. The government concludes that, with no final judgment, order, or decree on the issue, we lack jurisdiction to review it now.

The problem with the government's argument is that this is not an appeal of an ordinary bankruptcy matter, and thus 28 U.S.C. § 158(a) does not apply. Here Ramey appeals a criminal conviction that by necessity originated in the district court. That Ramey did not challenge the seizure in his bankruptcy proceeding would not have precluded him from challenging the seizure in the separate criminal case against him. He could have nonetheless asked the district court to suppress evidence of the passports. See FED. R. CRIM. P. 41(h) ("[a] defendant may move to suppress evidence in the court where the trial will occur").

Unfortunately, however, Ramey did not file in the district court a motion to suppress the evidence seized during counsel's execution of the impound order. This court has held that "a defendant who fails to make a timely suppression motion cannot raise that claim for the first time on appeal." United States v. Pope, 467 F.3d 912, 918 (5th Cir. 2006) (quoting United States v. Chavez-Valencia, 116 F.3d 127, 130 (5th Cir. 1997)). Because Ramey did not ask the

district court below to suppress the evidence, he has waived his right to raise the issue here.[2]

V.

Ramey alleges the search warrant executed on April 20, 2004, was defective because the affidavit on which it was issued did not establish probable cause to believe officers would find Ramey's passports at his home.

We note at the outset that on this issue Ramey's brief leaves much to be desired. He refers to the affidavit but does not identify it in the record below, as required by Federal Rule of Appellate Procedure 28. He does not offer a standard of review, also required by Rule 28. He cites a single case, United States v. Freeman, 685 F.2d 942 (5th Cir. 1982), for the proposition that there must be a "nexus" between the place to be searched and the evidence to be seized. He then makes the otherwise unsupported conclusion that the search warrant here was "nothing but a fishing expedition." As we have stated before, such assertions arguably "furnish nothing for review." United States v. Martinez-Mercado, 888 F.2d 1484, 1492 (5th Cir. 1989). Moreover, it is not our duty to comb the record for error; "it is counsel's responsibility to point out

---

[2] We recognize that there is some dispute as to whether, even if a defendant has waived an issue by failing to raise it in a motion to suppress, this court can nevertheless review for plain error. See United States v. Baker, 538 F.3d 324, 328-29 (5th Cir. 2008) (reviewing for plain error issue not raised in motion to suppress). We do not weigh in on that dispute here. We note, however, that if we were to review for plain error we would fine none. We find plain error only where there is "clear or obvious error" that affects "substantial rights." See, e.g., United States v. Gordon, 346 F.3d 135, 137 (5th Cir. 2003). As Ramey concedes, a United States passport is the property of the United States. 22 C.F.R. § 51.7(a) ("[a] passport at all times remains the property of the United States"). Because the seized passports were the property of the United States, Ramey had at best a diminished expectation of privacy in them. See California v. Ciraolo, 476 U.S. 207, 211 (1986) ("The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" (quoting Katz v. United States, 389 U.S. 347, 360 (1967)). In the light of this diminished expectation of privacy, we cannot say that Ramey's substantial rights were affected.

distinctly and specifically the precise matters complained of, with appropriate citations to the page or pages in the record." Id.

Nevertheless, we have reviewed the record and find this issue is without merit. Although Ramey does not mention it in his brief, the district court below denied his motion to suppress evidence obtained during the April 20 search, finding that the affidavit was sufficient to establish probable cause to believe Ramey's passports would be found at his home. Presumably it is this ruling Ramey now appeals.

In our review of a district court's denial of a motion to suppress, we accept the district court's factual findings "unless clearly erroneous or influenced by an incorrect view of the law." See, e.g., United States v. Maldonado, 472 F.3d 388, 392 (5th Cir. 2006). We cannot see how the district court's findings here were clearly erroneous. At a hearing on Ramey's motion to suppress, the district court found that the items identified by the affidavit – which included the passports – were linked to both Ramey and his home. The district court noted that the home that was searched was Ramey's only residence, as he had lost other property in a foreclosure. Ramey's family lived there and Ramey himself had been arrested there. Officers had previously seized passports from the home. Moreover, the affidavit stated that a cooperating witness had confirmed that Ramey conducted his business at the home. The district court found the affidavit provided ample basis to believe officers would find Ramey's subsequently-issued passport there, and Ramey has not shown that this finding was clearly erroneous. We therefore affirm the district court's denial of Ramey's motion to suppress.

VI.

Finally, Ramey also raises two issues solely to preserve error. We address these issues only briefly.

First, Ramey argues the district court erred in admitting officers' hearsay testimony that Ramey's wife and son told them that Ramey was not at home. He concedes circuit precedent forecloses this argument. See United States v. Adkins, 741 F.2d 744, 746 (5th Cir. 1984) ("When statements are introduced to prove the falsity of the matter asserted, they are not inadmissible as hearsay.").

Next, he contends counts 1-3 and counts 9, 11, and 12 were multiplicitous and should have been dismissed. Although he does not concede precedent forecloses this issue, he candidly states that circuit case law does not favor his position. We agree with the Government that under United States v. Shaid, 730 F.2d 225 (5th Cir. 1984), the counts were not multiplicitous. In Shaid a defendant who made six false statements in connection with two loans was charged with six separate false-statement counts. There we recognized that although the six false statements resulted in only two loans, the statements themselves were distinct and separate acts justifying six separate counts. Id. at 231. The same logic applies here. Counts 1 and 2 of Ramey's indictment charge him with having falsely stated (1) in his passport application, that his previously issued passport had been "lost" by him and (2) to a passport agent, that his previously issued passport had been "lost in lost luggage" in Houston, Texas. Count 3 charges him with having made false statements to a government officer by causing a phony letter urging that his application be expedited to be sent to the United States Passport Office. Although counts 1-3 all relate to Ramey's application for a new passport, as in Shaid the false statements in each count are nonetheless "distinct and separate." Similarly, counts 9, 11, and 12 charge three separate acts constituting obstruction of justice, specifically that (1) Ramey told his wife to lie to marshals; (2) he hid himself in an air conditioning vent to conceal himself from marshals; and (3) he caused someone else to screw the vent closed. As in Shaid, the counts charged here reflect distinct and separate acts

15

that are not multiplicitous.  The district court did not err in refusing to dismiss these counts.

## VII.

Accordingly, Ramey's conviction is AFFIRMED.