In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 14-1393, 14-1584 & 14-1589

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JULIO LEIJA-SANCHEZ, MANUEL LEIJA-SANCHEZ, and GERARDO SALAZAR-RODRIGUEZ,

*Defendants-Appellants.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 07 CR 224 — **Rebecca R. Pallmeyer**, *Judge*.

---

ARGUED OCTOBER 1, 2015 — DECIDED MAY 2, 2016

---

Before FLAUM, EASTERBROOK, and HAMILTON, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. An indictment charged four persons with arranging the murder of Guillermo Jimenez Flores (known as Montes) in Mexico in order to reduce competition against a Chicago-based criminal organization that created bogus immigration documents. The district court dismissed the principal count of this indictment, ruling that

it proposed the extraterritorial application of U.S. law, but we reversed. *United States v. Leija-Sanchez*, 602 F.3d 797 (7th Cir. 2010). We held that 18 U.S.C. §1959(a)(1), a part of RICO that forbids murder in aid of racketeering, applies to gangs whose activities are designed to affect commerce in the United States, even though some important acts take place abroad. We relied on *United States v. Bowman*, 260 U.S. 94 (1922), which took the same view of a statute designed to protect the United States Treasury from frauds, no matter where in the world the fraud was hatched, and announced that extraterritorial application of criminal laws is proper— when the U.S. statute accords with the law of nations—even when extraterritorial application of civil laws would not be.

On remand, one defendant pleaded guilty. (He has not appealed.) A jury convicted the other three of violating not only §1959 but also 18 U.S.C. §956(a)(1), which forbids any person "within the jurisdiction of the United States" from conspiring to commit a murder abroad. All defendants were sentenced to life in prison for the §1959 offense and a racketeering-conspiracy count, 18 U.S.C. §1962(d), plus 20 years for the §956 offenses. All defendants also were convicted of conspiring to produce false identification documents. 18 U.S.C. §371. The sentences on all counts run concurrently.

Appellants' principal argument is that our 2010 decision should be overruled. They rely on *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), which reiterated the presumption against extraterritorial application of civil statutes. Yet our 2010 decision recognized that U.S. law has such a presumption and thought it not controlling, for two reasons: first, *Bowman* distinguishes criminal from civil law, holding that different rules apply; second, the murder in Mexico was

arranged and paid for from the United States, and was committed with the goal of protecting a criminal organization that conducted business in the United States in order to defraud officials of the United States government as well as employers in the United States. The murder thus had ample links to the United States, and since §1959 covers racketeering in foreign commerce as well as in interstate commerce, we thought that its language applies.

*Morrison* does not undermine our 2010 decision. It does not mention either *Bowman* or §1959. A decision such as *Bowman*, holding that criminal and civil laws differ with respect to extraterritorial application, is not affected by yet another decision showing how things work on the civil side. More: *Morrison* itself saw no problem of extraterritoriality in applying the federal securities laws to foreign trading in securities registered in the United States. 561 U.S. at 266–70. In *Morrison* the Court held that Australian investors could not use U.S. securities laws to obtain relief with respect to trades that occurred in Australia and concerned the securities of an Australian issuer. That the fraud had in some sense been planned in the United States did not matter, the Court held, when the issuer, the trading, and the victims all were outside the United States. In our case, by contrast, the victims of the murder-for-hire scheme include the United States government and U.S. business.

Two appellants—Gerardo Salazar-Rodriguez and Manuel Leija-Sanchez—have a more substantial challenge to their §956 convictions. They were in Mexico when Julio Leija-Sanchez issued the contract to rub out Montes and contend that they were not "within the jurisdiction of the United States" when they conspired with Julio. They read "the ju-

risdiction of the United States" to mean "territory subject to United States sovereignty." The prosecutor, by contrast, reads this phrase to denote the *regulatory* rather than the *territorial* "jurisdiction" of the United States. Given our 2010 decision, the United States had the authority to penalize this murder, and "jurisdiction" in §956 means no more than that. The prosecutor contends that *Ford v. United States*, 273 U.S. 593, 622–24 (1927); *United States v. Amawi*, 695 F.3d 457, 494 (6th Cir. 2012); *United States v. Fernandez*, 559 F.3d 303, 325 (5th Cir. 2009); and *United States v. Wharton*, 320 F.3d 526, 537–38 (5th Cir. 2003), support this understanding—though *Ford* does not concern §956 and the meaning of "jurisdiction" was not contested in the other cases. The district court gave an instruction tracking the prosecutor's view.

The Supreme Court has remarked that "jurisdiction … is a word of many, too many, meanings". *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 90 (1998). The prosecutor's understanding of "jurisdiction" would make that word surplus, because *every* federal criminal statute applies only if the United States has prescriptive authority and the district court has subject-matter jurisdiction (supplied by 18 U.S.C. §3231). We recognize that Congress sometimes adds unnecessary language, just to be sure. Still, using a word such as "jurisdiction" without a definition or cross-reference begs for trouble. Maybe the word means the territory of the United States, see 18 U.S.C. §5; maybe it means prescriptive authority; maybe it means something like the "special maritime and territorial jurisdiction of the United States," a phrase defined in 18 U.S.C. §7. A court would be sorely tempted to invoke the Rule of Lenity and hold that ambiguity must be resolved in favor of the accused.

This is as far as appellants get, however, because they did not object in the district court. When the district judge asked whether appellants had any objections to the instructions on §956, their lawyers stood mute. The prosecutor argues that this was a waiver, but even if we treat it as just a forfeiture it dooms the argument to review under the demanding plain-error standard. See *Molina-Martinez v. United States*, No. 14–8913 (U.S. Apr. 20, 2016), slip op. 4–5; *United States v. Olano*, 507 U.S. 725, 732–33 (1993). One element of this standard is that an error be plain—"that is to say, clear or obvious." *Molina-Martinez* at 4. The meaning of the word "jurisdiction" is not "clear or obvious." Judicial explication might add clarity, but appellants do not contend that any court of appeals has given §956 the meaning they prefer.

Even plain errors just set up the opportunity for reversal; a court of appeals has discretion to affirm when the error does not seriously affect the fairness, integrity, or public perception of judicial proceedings. *Molina-Martinez* at 5. We do not see any problem with the §956 convictions under that standard. Although appellants set out to kill Montes, the §956 convictions do not add to their imprisonment. Twenty-year sentences that run concurrently with natural-life sentences can't be called miscarriages of justice. The only marginal penalty for each §956 conviction is the $100 special assessment. That assessment abrogates the concurrent-sentence doctrine, see *Ray v. United States*, 481 U.S. 736 (1987), but it does not remove the court of appeals' discretion to decide that it would be just to let a concurrent sentence stand on plain-error review. We leave for another day the meaning of "jurisdiction" in §956.

All defendants were sentenced to life imprisonment for racketeering conspiracy, in violation of §1962(d), as well as for the §1959 offense. The usual maximum penalty for a violation of §1962 is 20 years, but "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment" then the §1962 maximum becomes life. 18 U.S.C. §1963(a). The prosecutor contended in the district court that three of defendants' predicate crimes carry maximum sentences of life: first-degree murder in violation of Illinois law, plus each §956 count. The jury returned special verdicts that supported each theory, and the judge sentenced all three defendants to life imprisonment on the §1962(d) convictions.

Defendants contest those sentences on appeal. Two say that their §956 convictions are invalid (that's the subject we've just covered), and all three say that Illinois does not understand its murder statute to apply when the death occurs out of state, even if a contract murder was arranged in Illinois. All defendants also contend that the §956 convictions do not support a life sentence for RICO conspiracy because their sentences under §956 were 20 years (though the statutory maximum under §956 is life).

To these arguments, the prosecutor has essentially no reply. The United States does not contend that Illinois would apply its murder statute when the death occurs out of state. It does not rely on the fact that murder can produce a life sentence in Mexico, perhaps because the definition of murder as a racketeering act in 18 U.S.C. §1961(1)(A) does not include foreign law. And the United States does not try to defend the life sentences on the basis of the §956 convictions,

perhaps because §1961(1) does not include §956 among racketeering acts.

Instead the United States asks us to disregard all of defendants' arguments about the RICO-conspiracy sentence on the ground that our 2010 decision implicitly rejected them. It did no such thing. It concerns only §1959, which provides life sentences for murders in the course of RICO enterprises without the need to ask whether some *other* statute also does so. We therefore conclude that the prosecutor has forfeited any defense of the life sentences defendants received for violating §1962(d), and we remand with instructions to reduce those sentences to 20 years' imprisonment. Resentencing on other counts is unnecessary, however, because this change does not affect the life sentences under §1959, which are required by the statute. (The only other penalty authorized by §1959(a)(1) in the event of murder is capital punishment.)

Defendants make one final argument: that the prosecutor spoiled the trial by contending in closing argument that Montes had been hit by 15 bullets.

They do not deny sending a hit man to kill Montes. They hired someone with the street name "Chapulin" to do the deed. He bragged that he had done so, with the aid of "Chatito," and some of his statements were recorded. In one recording Chapulin said that he emptied a clip of 15 cartridges into Montes's body and would have fired more, but that he had left his 28-round clip in his car. A pathologist who examined the body in Mexico concluded that 21 bullets entered Montes's body. Defendants contend that this shows that Chapulin was lying when he claimed credit and that someone else must have carried out the killing. If Montes was killed by a random street thug or robber, defendants'

sentences would be lower even though their convictions for conspiring to murder him would stand.

During his closing argument, the prosecutor contended that the pathologist had miscounted and that only 15 slugs had entered Montes's body. Appellants insist that prosecutors cannot contradict their experts, but the rule that litigants vouch for their witnesses was jettisoned by Fed. R. Evid. 607 and has little support elsewhere. See, e.g., *Chambers v. Mississippi*, 410 U.S. 284, 296–98 (1973). Our decision in *United States v. Klebig*, 600 F.3d 700 (7th Cir. 2010), on which defendants rely, does not resurrect the voucher doctrine in the teeth of Rule 607. The problem with the prosecutor's closing argument in *Klebig* was not just that the prosecutor disagreed with an expert witness, but that the prosecutor then made a claim (about how markings on the barrel of a sawed-off shotgun fit with those on a silencer) that had no support in the record. In this case, the prosecutor tried to show how the pathologist's own observations supported a bullet count of 15 better than 21. The district court instructed the jury that the prosecutor's argument was not itself evidence and that the verdict had to be based on what the witnesses said. That sufficed. The district judge did not abuse her discretion in handling this subject.

For what it is worth, we don't see why the bullet count matters. Suppose Montes was killed by 21 bullets, as defendants insist. This may mean that Chapulin was lying about (or forgot) which clip he used, not that he was lying about shooting Montes. Or it may mean that Chatito fired some shots. The defense's argument that someone else just happened to kill the target of a murder-for-hire plot before the hit man got there relies on nothing but speculation, and

the probability that an assassin's target would meet a violent death some other way, but at the same time, is low. The verdict and life sentences cannot be blamed on a debate between the prosecutor and the pathologist about how to count the holes in Montes's body. Any error was harmless.

The sentences on the §1962(d) count are reduced to 20 years, and the judgments otherwise are

AFFIRMED.